**D.H. FLEENOR, Petitioner,**

v.

**Robert A. FARLEY, Respondent.**

**No. IP 94–717–C–H/G.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Feb. 2, 1998.

Alan M. Freedman, Freedman & Bornstein, Chicago, IL, Carol R. Heise, Attorney at Law, Evanston, ·IL, for Plaintiff.

Geoff Davis, Office of Attorney General, Indianapolis, IN, for Defendant.

## ENTRY ON PETITION FOR WRIT OF HABEAS CORPUS

HAMILTON, District Judge.

Petitioner D.H. Fleenor is a prisoner of the State of Indiana under a sentence of death. He was convicted in the Johnson Circuit Court of two counts of murder and one count of burglary in the murders of his

wife's mother and stepfather, Nyla Jean Harlow and Bill Harlow. His convictions and sentence were affirmed on appeal in *Fleenor v. State,* 514 N.E.2d 80 (Ind.1987) (*Fleenor I*). A state trial court denied his petition for post-conviction relief, and that denial was affirmed on appeal in *Fleenor v. State,* 622 N.E.2d 140 (Ind.1993) (*Fleenor II*). The Supreme Court of the United States denied *certiorari* review of both final decisions. In this action, Fleenor petitions for a writ of habeas corpus setting aside his convictions and sentence. The respondent has filed a return to the court's order to show cause, and Fleenor has filed his reply. The court has reviewed in detail the records of the proceedings in the state courts and finds no need for an evidentiary hearing. For the reasons explained below, the court denies Fleenor's petition for a writ of habeas corpus.

## Background

The evening of December 12, 1982, Fleenor murdered Nyla Jean Harlow and Bill Harlow, the mother and stepfather of his estranged wife, Sandra Sedam. Fleenor committed the murders in the Harlows' home in front of Sandra, her son, and two other Harlow grandchildren. Fleenor was charged in the Jefferson Circuit Court with two counts of murder and one count of burglary. The trial was moved to Johnson County, where a jury found Fleenor guilty of each of the charges. The record shows the following facts.

The night before the murders, Fleenor was drinking in a bar. He told an acquaintance that he was going to "kill all five of them" and that he also ought to kill Judge Hoying of the Jefferson Superior Court. 11 TR 3567, 3569, 3581.[1] Fleenor also told this acquaintance that he would see Fleenor in the paper. 11 TR 3575–76. Fleenor told the bartender that he would probably never see Fleenor again because

he would be spending the rest of his life in jail. 11 TR 3590. Late the next morning, Sunday, December 12th, he told a friend about the problems he was having with the Harlows and said that he ought to get a gun and kill them. 11 TR 3603, 3613–14. That afternoon, with the help of another friend, Fleenor bought a .22 caliber pistol and some ammunition from an acquaintance. 11 TR 3622–26. The Supreme Court of Indiana continued the story in *Fleenor I*:

> During the course of the afternoon, [Fleenor] consumed approximately four beers, and he smoked a marijuana cigarette. He did not appear to be drunk or out of control to his companion. Between 4:00 p.m. and 5:00 p.m., Sandra Sedam and Nyla Harlow were Christmas shopping at a department store. At the store, they encountered [Fleenor], and they talked to him for about ten minutes. [Fleenor] was agitated and might have been drinking before this conversation. At approximately 6:30 p.m., [Fleenor] sought out Sandra Sedam at a church service. He behaved properly in the church, he apologized for the earlier meeting, and then he left.

514 N.E.2d at 82–83. Fleenor then got a ride to the Harlows' home from two other friends, Michael Albert and Ron Griffin. Fleenor told them that two girls lived there and that their father did not like him. He asked Griffin to go to the front door and, if a man answered the door, to say he was looking for "John Smith." As Griffin went to the door, he saw Fleenor duck down in the back seat of the car. 11 TR 3700–06, 3682–84. No one answered the door. Griffin returned to the car. Fleenor then got out of the car and said he would wait for the people coming back to the house. After Griffin and Albert drove away, Fleenor broke into the Harlows' home by prying open the back door. He replaced the screws to conceal the break-

1. This citation form refers to volume 11 and a particular page of the original trial record. The citation form "PC ___" refers to pages of the record in the state post-conviction proceeding.

in. He hid in a bedroom closet and waited. 12 TR 3780–81.

At about 7:30 p.m., Bill and Nyla Jean Harlow returned home from church with Sandra Sedam, Sandra's son Justin, and Bill Harlow's grandchildren Billy and Angie. At that time Justin was two years old, Billy was ten, and Angie was twelve. Bill and Nyla Jean started talking about Fleenor having shown up at the church. At that point, Fleenor appeared in the hallway. He shot Bill in the abdomen. Bill collapsed to the floor, but that wound was not fatal. (The coroner testified that the shot to Bill's abdomen did not penetrate the subcutaneous tissue, did not enter the abdominal cavity, and would not have been fatal. 10 TR 3429–30.) Fleenor ordered the two women and the children to sit on the couch and not to help Bill. To make his point, Fleenor threatened to kill two year old Justin if they did not follow his orders. 11 TR 3737. After a time Fleenor allowed Nyla Jean to go to her husband Bill. As she tried to assist Bill, Fleenor took aim and shot her in the top of the head from across the room. The shot was fatal, but she made noises for a time as if she were suffering. 11 TR 3739–40; 12 TR 3933. Fleenor then ordered Sandra and the two older children to carry her into the bedroom. 11 TR 3739–40.

Fleenor later discovered that Bill Harlow was still conscious. Bill was asking about his wife and begged Fleenor not to leave him there. Bill told him that he was unable to get up, but Fleenor said that he had once been shot and had been able to move. 12 TR 3938. Sandra pleaded with Fleenor not to shoot Bill again, but Fleenor said, "You know I have to ... I can't let him suffer any more." Fleenor then fired one more shot into the back of Bill's head, killing him. 10 TR 3429–30, 12 TR 3908, 3938.

During the evening Fleenor became concerned that other family members might come to the Harlows' home, so he forced Sandra, Billy, Angie, and Justin to drive with him to the home of James Sedam, Sandra's brother.[2] Fleenor then ordered Angie to tell James that they were going out of town for a few days, and he threatened to shoot the others in the car and the people in James' house if she did not follow his orders. 11 TR 3743; 12 TR 3909, 3940. Angie gave James the message, and Fleenor, Sandra, and the children then returned to the Harlow home. Fleenor barricaded the children into one room, and he and Sandra spent the night in another bedroom. 12 TR 3875–76. The bodies of Nyla Jean and Bill Harlow were still in the house. The next morning, Fleenor took money and a checkbook from Bill's wallet and Nyla Jean's purse. Then he, Sandra, Billy, Angie, and Justin drove to Tennessee. While in Tennessee, Fleenor called his mother in Indiana and told her that he thought he had killed the Harlows. A few days later, a SWAT team of Tennessee police surrounded the house where Fleenor and his family were staying. Fleenor held his family hostage for a time, threatening to kill the children if the police interfered. 12 TR 3776, 3951. He was eventually arrested by the use of force. 10 TR 3446–60; 12 TR 3771–78, 3952–53.

Fleenor was returned to Indiana to face charges of murder and burglary. He was held in the Jefferson County Jail. The prosecutor filed notice of his intention to seek the death penalty. While in jail, Fleenor wrote several letters to a girlfriend, Debra Slaughter. 12 TR 3982–97. He begged her to break him out of jail by obtaining a gun and a car, and by then forcing the night police dispatcher to unlock his cell at gunpoint. The letters contain detailed instructions for carrying out an escape. Fleenor had his mother secretly take those letters to Slaughter. One letter read in part:

This hurt's me deeply to say but sweet heart I've only got a matter of time to live. I talked with my to attorney's the

---

2. The testimony of witnesses conflicted as to whether Fleenor fired the shot that killed Bill Harlow before or after the trip to James Sedam's house.

past to day's. There is no hope for me I'm getting the death sentence. I didn't think they had it here in Indiana but they do I've got 2 charge's of first degree murder one charge is enough on the way I done thing's that's not all burgular to comit bodily harm kidnapping Interstate Flight. My lawyer's told me I was for sure to get the chair and I know myself. I've got 17 witness against me. I went for the crazy test today They said there was nothing wrong with me at the time.

12 TR 3983–3(sic). Another letter said in part:

Yesterday a guy from the State Hospital came down to talk to me I blew up on him I admitted I done it said I'd do it again if I had it to do all over I went wild with my mouth. I'm hung before I even go to court. Dam they got more witness from out of these bar's down here that heard me say time and time again I was going to do it. What the hell can I say but get me out of this fuckin place while you can if you love me and want to be with me.

12 TR 3987–2(sic). Another letter told Slaughter: "Don't kill nobody unless it's the last thing you can do," and to shoot the dispatcher in the arm if he tried to touch the radio. 12 TR 3984–4 & –5. Fleenor told Slaughter it was urgent that she help him escape before he was transferred to a more secure jail in another county. Police arrested Slaughter in a Laundromat across the street from the jail one night before Fleenor was scheduled to be transported to the other jail. She was driving a recently borrowed car and was carrying a recently purchased pistol. 12 TR 3979–81.

In a trial conducted in December 1983, a Johnson County jury found Fleenor guilty on two counts of murder and one of burglary. Indiana statutes provide that after a guilty verdict is returned on a capital offense, the jury hears evidence, arguments and instructions on the death penalty and then makes a recommendation to the trial judge as to whether the death

sentence should be imposed. The judge makes the actual sentencing decision. See Ind.Code § 35–50–2–9(d) & (e). Pursuant to the statutory procedure, the jury heard evidence and argument concerning the State's request for a recommendation on the death penalty. During the sentencing phase of the trial, Fleenor conceded that three aggravating factors had been proven beyond a reasonable doubt. He had committed the murders by lying in wait; he had committed the second murder of Bill Harlow knowing that he had already murdered Nyla Jean Harlow; and he committed the murder in the course of committing burglary. 16 TR 4998 (closing argument). The jury recommended the death penalty. After a further hearing, Judge Larry J. McKinney sentenced Fleenor to death. He found that three statutorily defined aggravating factors had been proven beyond a reasonable doubt: (1) commission of a murder during the perpetration of a burglary; (2) commission of a murder by lying in wait; and (3) commission of multiple murders. See Ind.Code § 35–50–2–9. He found no mitigating circumstances. Additional facts are set forth in the discussion of specific issues.

## Issues

Fleenor raises many constitutional challenges to both his conviction and his death sentence. He contends:

1. The jury was led to believe that responsibility for determining the appropriateness of the death sentence rested elsewhere, contrary to the mandate of *Caldwell v. Mississippi*, 472 U.S. 320, 328–29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

2. Fleenor's trial counsel failed to provide effective assistance at sentencing by failing to adequately investigate and introduce available mitigating evidence.

3. The trial court erroneously failed to excuse jurors for cause who had said they would automatically recom-

mend the death penalty for any person convicted of murder.

4. The trial court failed to consider Fleenor's arguments at sentencing and failed to weigh the evidence of mitigation that was introduced.

5. The prosecutor misstated the law and the evidence and improperly appealed to the jurors' emotions in both the guilt-innocence and sentencing phases of the trial.

6. The jury heard improper evidence, argument, and instructions concerning the possibility that Fleenor might be released after a relatively short time in prison if not sentenced to death.

7. The trial court's jury instructions at both phases of the trial deprived Fleenor of a fair trial.

8. The prosecutor violated the Fifth, Sixth, Eighth, and Fourteenth Amendments by using evidence regarding Fleenor's future dangerousness.

9. The trial court relied on two invalid aggravating circumstances (murder in the course of a burglary and murder by lying in wait).

10. Indiana's death penalty statute is unconstitutional on a variety of grounds.

The court addresses the issues in order.

### Discussion

■ Fleenor brings his petition under 28 U.S.C. § 2254(a), which provides that a writ of habeas corpus may issue if Fleenor is "in custody in violation of the Constitution or laws or treaties of the United States." Under the legal standards that apply to Fleenor's petition, this court must make independent and plenary judgments about the legal issues presented, rather than merely asking whether the state courts applied federal constitutional law unreasonably. See *Abrams v. Barnett*, 121 F.3d 1036, 1037–38 (7th Cir.1997); *Lindh v. Murphy*, 96 F.3d 856, 861 (7th Cir.1996) (*en banc*) (discussing law prior to enactment of Anti–Terrorism and Effective Death Penalty Act of 1996), citing *Brown v. Allen*, 344 U.S. 443, 458, 73 S.Ct. 397, 97 L.Ed. 469 (1953). In addition, Fleenor may draw on the entire body of federal case law, rather than being restricted only to decisions of the Supreme Court. *Abrams v. Barnett*, 121 F.3d at 1037–38.[3]

## I. THE APPLICATION OF CALDWELL v. MISSISSIPPI TO ARGUMENTS AND INSTRUCTIONS CONCERNING THE EXTENT OF THE JURY'S RESPONSIBILITY FOR A DEATH SENTENCE.

■ A death sentence may not be based on "a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell v. Mississippi*, 472 U.S. 320, 328–29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In *Caldwell* the defense used part of its closing argument to emphasize to the jury both the gravity and the responsibility of a verdict for death. Defense counsel

---

**3.** The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104–132, 110 Stat. 1214, substantially revised the standards that federal courts apply to petitions under § 2254, but the new legislation does not apply to petitions filed before its enactment. See *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Fleenor filed his petition before enactment of the AEDPA. After the principal briefing was completed, however, the Seventh Circuit held that the new act applied to pending petitions. *Lindh v. Murphy*, 96 F.3d 856, 867 (7th Cir.1996)

(*en banc*). This court therefore shifted to evaluating Fleenor's petition under those new, more restrictive standards. The Supreme Court then granted *certiorari* in *Lindh* to decide whether the new act applies to pending petitions. At that point this court postponed further consideration until the Supreme Court decided which set of legal standards would apply here. The Supreme Court resolved the issue in *Lindh* when it reversed the Seventh Circuit's decision in June 1997. 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481.

told the jury: "It's going to be your decision. \*\*\* You are the judges and you will have to decide his fate. It is an awesome responsibility, I know—an awesome responsibility." In rebuttal, the prosecutor told the jury that the defense argument was unfair because the defense counsel "know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable. They know it." After defense counsel objected, the trial judge overruled and explained: "I think it is proper that the jury realizes that it is reviewable automatically as the death penalty commands. I think that information is now needed by the Jury so they will not be confused." The prosecutor then repeated to the jury that their decision is "automatically reviewable by the Supreme Court." See 472 U.S. at 325–26, 105 S.Ct. 2633.

■ The problem that the Supreme Court identified in *Caldwell* was that the prosecutor, with the explicit approval of the trial judge, had been permitted to minimize the jury's role and actually to *mislead* them about their role. As the dissenting justices in the state supreme court had said: "There is no appellate mercy." Without an explanation of the limited role of appellate review in determining whether a death sentence is warranted in a case, the comments of the prosecutor and judge violated the defendant's Eighth Amendment rights. "[T]he uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role." *Id.* at 333, 105 S.Ct. 2633. "This Court has always premised its capital punishment decisions on the assumption that a capital sentencing jury recognizes the gravity of its task and proceeds with the appropriate awareness of its 'truly awesome responsibility.'" *Id.* at 341. *Caldwell* was decided while Fleenor's case was still on direct review, so Fleenor is entitled to rely on the principles announced there. *See Teague v. Lane,* 489

U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); *Sawyer v. Smith,* 497 U.S. 227, 241–45, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990).

Under the Mississippi law at issue in *Caldwell* and under the death penalty laws of most states, the jury in a capital case makes the decision whether to impose the death penalty. That is not true, however, in at least Indiana, Florida, and Alabama. In these states, the jury's verdict at the sentencing phase of the trial is a recommendation to the trial judge, who must make the sentencing decision. See *Roark v. State,* 644 N.E.2d 565, 570 (Ind.1994) (summarizing Indiana structure of death penalty sentencing). This difference raises questions about how the principles of *Caldwell* apply in a trial where the jury makes a sentencing recommendation rather than a sentencing decision. The challenge is to instruct the jury accurately about its role in the sentencing decision without unduly minimizing or exaggerating that role, and yet, at the same time, to avoid confusing the jury about the often complex and constantly evolving processes and standards for appellate and collateral review of death sentences.

The Supreme Court of the United States has not yet addressed directly those questions in the context of a jury recommendation statute, see *Dugger v. Adams,* 489 U.S. 401, 408 & n. 4, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989) (in case arising in Florida, noting that merits of *Caldwell* claim were not presented), nor has the Seventh Circuit addressed them under Indiana's jury recommendation statute. The Eleventh Circuit has often dealt with this problem. *See, e.g., Davis v. Singletary,* 119 F.3d 1471, 1481–82 (11th Cir.1997); *Mann v. Dugger,* 844 F.2d 1446 (11th Cir.1988) (*en banc*) (prosecutor's closing argument to jury required reversal of death sentence pursuant to *Caldwell*); *Harich v. Dugger,* 844 F.2d 1464 (11th Cir.1988) (*en banc*) (comments by prosecutor and trial judge did not require reversal of death sentence under *Caldwell*). The Supreme Court of

Indiana has also recognized that the principles of *Caldwell* can require reversal of death sentences under Indiana's jury recommendation statute. See *Fleenor II*, 622 N.E.2d at 143; *Burris v. State*, 558 N.E.2d 1067, 1071 (Ind.1990) (deciding *Caldwell* claim on the merits); *Wallace v. State*, 553 N.E.2d 456, 469–70 (Ind.1990) (same).

*Caldwell* applies only where the jury is misled about its role in the sentencing process in a way that allows it to feel less responsible for the sentencing decision than it actually is. This is clear from the majority/plurality opinion in *Caldwell*, from Justice O'Connor's concurring opinion, and from later comments by the Court in *Dugger v. Adams*, 489 U.S. 401, 407, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989); *Darden v. Wainwright*, 477 U.S. 168, 183–84 n. 15, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); and *Romano v. Oklahoma*, 512 U.S. 1, 9, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). That is, to violate the principles of *Caldwell*, the remarks to the jury must describe inaccurately the role of the jury under state law. The court first reviews the relevant comments and then analyzes them in terms of their accuracy as a matter of Indiana law.

### A. *The Remarks to the Jury*

The role of the jury in the sentencing decision was the subject of argument by both counsel and instructions by the court. In the closing argument in the penalty phase of the trial, Fleenor's counsel argued:

> Imposing a death sentence is not a routine decision and our law does not permit anyone who would impose it, routinely, to sit on a Jury. The law requires that you determine whether the nature of both— both the offense and the offender are such that death must be imposed. If they are not, it is your obligation to return a recommendation against the death penalty. Now, in a short time, His Honor will instruct you on how you are to approach the recommendation of whether or not to kill D.H.

Fleenor and what factors you are to consider in doing that.

16 TR 4997. He continued later:

> In making a decision of this magnitude, you want to be very certain that you are correct. You want to be very certain that death is the right sentence before you recommend D.H. to the electric chair. Now, I know that not one of you would return the death recommendation unless you were absolutely certain you were doing the right thing. It doesn't matter that none of your fellow Jurors would agree with you. You can have 11 Jurors coming out the other way, but if you believe—if you believe that a death recommendation is wrong, you have the responsibility to stay with your convictions and insist on a recommendation against the death penalty. Please have the courage to do that. This is your responsibility, as a Juror. You owe it to this Court and you owe it to yourself— mostly, to yourself. There is no way that you can ever escape or avoid the responsibility for recommending to take the life of a fellow human being. This is a personal responsibility that exists in this courtroom, today, and is upon the shoulders of each one of you. It is yours and yours, alone.

17 TR 5009–10. He added a few moments later:

> You have to decide whether this case is one of those few homicide cases in which it is necessary that the death penalty be recommended. We're not here to debate whether or not there should be capital punishment to the—it's already on the books. But, your answer to our questions on it, in voir dire, in those answers, everyone of you indicated that you would be willing to consider the possibility of imposing the death sentence, in certain cases. But death is not meant to be the punishment for all homicides. Otherwise, we wouldn't need to be here, today. I want to make that very clear. There is no case in which the law requires a death sentence; there

is no case in which a death sentence must be imposed. This is purely your personal decision. You decide; you recommend. You recommend.

17 TR 5013–14.

The prosecutor responded to this line of argument in his rebuttal argument:

And there was a lot of talk about what if we make a mistake. I've thought about that. What if I'm wrong? You know. You've got to put a lot of people through a lot of—a lot of trouble, not to mention the defendant. What if I'm wrong? What if you're wrong? The Judge is going to consider your final recommendation, in this case. Or his re—your recommendation. He's gonna make the final decision, Number One. Number Two, the law of this State requires—it's not optional—it requires that every death penalty decision is reviewed by the Supreme Court of this State. The Supreme Court of Indiana is gonna, automatically, review a death penalty case in this State. There's governors; there's Federal Judges; U.S. Supreme Court Justices and the U—U.S. Supreme Court, itself. You folks live in the real world and you know that that's—that's not—this is not the end of this case. The bird is not in your hands. You are asked to make a recommendation—a serious recommendation. It's not the end of this case. First of all, it's not a bird—it's not an innocent bird.[4] And, secondly, it's not in your hands. You're only part of the system. I'm only part of it. You're only part of it. The Judge is only part of it. The Supreme Court—it's possible for human beings to make mistakes. Our law is a wise and reasonable law—they understand that. It doesn't say that uh—that the life of D.H. Fleenor is in your hands. It knows that even 12 wise people, in Johnson County, might make a mistake. It takes into—that into account and it says that not only the Jury, but the Judge who sits through the evidence, shall consider it. Maybe the Jury's wrong; maybe they missed something in the evidence; maybe they didn't apply this balancing of mitigating circumstances versus aggravating circumstances, correctly. And, then, we go to the Indiana Supreme Court—well, what if the Judge is wrong? Maybe he's made a mistake. We go to the Indiana Supreme Court and then beyond that there are—like I said, we live in a real world, we know there are many other recourses if somebody's made a mistake in this kind of case. Is it really necessary? Is it really necessary? Well, I ask you: Is that the issue in this case? Has anyone said that that is the issue in this case? The bird is not in your hands, Ladies and Gentlemen. It's in the hands of—many of the branches of law enforcement in this—or, criminal justice in this State.

17 TR 5072–75.

In his instructions to the jury on the death penalty issue, the trial judge instructed the jury about weighing aggravating and mitigating factors, and then, with respect to the role of the jury's decision, instructed as follows:

The Court is not bound by your recommendation. If the State failed to prove beyond a reasonable doubt the existence of at least one aggravating circumstance or if you find that any mitigating circumstances outweigh the aggravating circumstances, you should not recommend the death penalty. If the State did prove beyond a reasonable doubt the existence of one aggravating circumstance and you further find that such aggravating circumstances outweigh any mitigating circumstances, you may recommend that the death penalty be imposed.

\* \* \* \* \* \*

---

4. The prosecutor's references to the bird were made in response to a parable used by defense counsel in which two boys were walking in the woods, one held an injured bird in his hands, and the other urged him to kill it. See 17 TR 5029–30.

You, the Jury, are vested with the power by statute to recommend to this Court, under the circumstances previously discussed, whether or not the defendant is to receive the death penalty. Although your recommendation is not binding upon this Court, it is a very valuable contribution to the decision making process of this Court.

\* \* \* \* \* \*

Your verdict must be unanimous. The Court shall make the final determination of the sentence after considering the Jury's recommendation and the sentence shall be based on the same standards that the Jury was required to consider. The Court is not bound by the Jury's recommendation.

17 TR 5088–90, 5092.

In addition to these comments in closing arguments and instructions on the death penalty, the role of the jury's decision had been addressed earlier in voir dire. As the Supreme Court of Indiana described it, the trial judge's questions commonly took the following form:

[I]t's the Courts responsibility ultimately, you make a recommendation to the Court, the Court either follows it or doesn't, and then the Court … can impose the death penalty, not impose the death penalty, and can give a sentence … with a wide range of possibilities. You're not … charged with that responsibility in this case.

\* \* \* \* \* \*

Now your recommendation is just that. It's a recommendation it is not binding on the Court.... The Court may ignore it; the Court can accept it. In the final analysis the decision will be up to the Court.

*Fleenor II*, 622 N.E.2d at 143.

B. *The Jury's Role Under Indiana Law*

In *Fleenor II*, the Supreme Court of Indiana reviewed the challenged remarks of the trial judge and said they are "consis-tent with roles defined for judge and jury, but are not entirely accurate. They do not inform the jury that the judge is required to give due consideration to the recommendation in deciding upon the sentence." 622 N.E.2d at 143. Concerning Fleenor's complaint that the judge had not made strong statements about the importance of the recommendation, such as those approved in *Huffman v. State*, 543 N.E.2d 360, 372 (1989), the Indiana court said this complaint "is not unjustified. The trial court's advice would have been better had some such statements been interjected." 622 N.E.2d at 144. The Supreme Court of Indiana declined, however, to set aside the death sentence. It explained that the comments during voir dire had to be taken in context, keeping in mind that jurors learn more about the trial and their role in it during the course of the trial. *Id.* The court then explained:

The information supplied in the final summations of counsel must also be considered in its proper place. Jurors become aware of the role of attorneys as advocates during the trial. Most jurors understand the difference between evidence, statements of counsel, and admonitions of the court. Following the deliberation and rendition of the verdicts of guilty, the jury would be fully aware of the nature and importance of its recommendation. Defense counsel's exaggeration that the defendant's life was in the jurors' hands would have been received as such, and the trial prosecutor's reference to appellate review of the decision acts as a counter thrust having little or no bearing on the jury's recommendation role.

Thus, we think that the importance placed upon the sentencing phase of the trial as it unfolded, together with the trial court's formal instructions, ameliorated any tendency of the deficiencies or shortcomings in voir dire examination, the summations, and the jury instructions, to dilute the sense of jury responsibility. We find no significant danger

of an Eighth Amendment violation, and affirm the trial court's rejection of this ground for relief on its merits.

*Id.* at 144–45.

Despite the comments by the Supreme Court of Indiana about ways in which the issue might have been handled better, the trial court did not mislead the jurors about their role in sentencing. At the time Fleenor was tried, the Supreme Court of Indiana had recently said about the jury's role in capital sentencing:

> Notwithstanding that the sentence determination by the jury is not binding upon the judge, we do not regard it as a mere formality having no substantive value. If we did, error if any, in such regard [instructing jury about terms of years] could not be other than harmless. On the contrary, the recommendation of the jury is a very valuable contribution to the process, in that it comes from a group representative of the defendant's peers, who are likely to reflect, collectively, the standards of the community.

*Brewer v. State,* 275 Ind. 338, 417 N.E.2d 889, 909 (1981). The final instructions to the jury at the sentencing phase of Fleenor's trial echoed this recent language from *Brewer:* "Although your recommendation is not binding upon this Court, it is a very valuable contribution to the decision making process of this Court." 17 TR 5090.

In the years since Fleenor's trial, the Supreme Court of Indiana has repeatedly addressed the appropriate roles for judge and jury in capital sentencing, especially in cases in which trial judges have made decisions contrary to the jury recommendations. In *Martinez Chavez v. State,* 534 N.E.2d 731, 735 (Ind.1989), the court reversed the trial judge's sentence of death imposed after the jury recommended against it. The court stated the rule it would apply:

> In order to sentence a defendant to death after the jury has recommended against death, the facts justifying a death sentence should be so clear and

convincing that virtually no reasonable person could disagree that death was appropriate in light of the offender and his crime. A trial court cannot override the jury's recommendation unless the facts meet this standard.

534 N.E.2d at 735. Because reasonable people could differ on the appropriateness of the death penalty for the defendant in that case, the trial court was held to have erred when it overrode the jury's recommendation and the death sentence was reversed. The Supreme Court of Indiana adhered to this view in denying rehearing, although it clarified that the reasonableness applied not to jurors as people but to their recommendation. *Martinez Chavez v. State,* 539 N.E.2d 4, 5 (Ind.1989). In two later cases, the court applied the *Martinez Chavez* standard and reversed death sentences that had been imposed contrary to jury recommendations. *Jackson v. State,* 597 N.E.2d 950, 955–56 (Ind.1992); *Kennedy v. State,* 620 N.E.2d 17, 19–20 (Ind.1993). In *Roark v. State,* the court revisited the issue and concluded that the *Martinez Chavez* standard needed modification because it interfered with the trial court's explicit statutory authority not to be bound by the jury's recommendation. 644 N.E.2d 565, 570 (Ind.1994). The court went on to require trial courts, at the point of final decision, to "reflect upon the jury recommendation against imposing death." *Id.* The court also said, however, that in carrying out its own obligation under the Indiana Constitution to review the appropriateness of death sentences, it would still apply the *Martinez Chavez* standard. That is, during review of a death sentence where the jury had recommended against death, the Supreme Court of Indiana would not affirm a death sentence unless "all the facts available in the record point so clearly to the imposition of the death penalty that the jury's recommendation is unreasonable." *Id.* at 571. A divided court in *Roark* reversed the death sentence despite powerful evidence supporting its imposition. The court majority found

that evidence of the defendant's horrific childhood, alcoholism, drug abuse, limited intelligence, mental impairment and illness, and lack of prior criminal history, and certain other factors would permit a reasonable decision against the death penalty. *Id.* at 573. In *Schiro v. State,* 669 N.E.2d 1357 (Ind.1996), the court adhered to the *Martinez Chavez* standard and again reversed a sentence of death imposed by a trial judge after a jury had recommended against death.

Even more recently, in *Peterson v. State,* the Supreme Court of Indiana appears to have reached consensus on the issue:

> As part of our death penalty review we will independently consider the jury recommendation against death and determine whether the death penalty is appropriate. However, we will *not* employ a standard that requires the facts in the record to so clearly point to the imposition of the death penalty that the jury's recommendation is unreasonable.

674 N.E.2d 528, 540 (Ind.1996) (emphasis in original); accord, *id.* at 543 (Sullivan, J., concurring) ("Several times we have attempted to articulate a standard for jury overrides but never without drawing dissents. While I myself find the approach articulated by Chief Justice Shepard in *Martinez Chavez,* 539 N.E.2d at 5, to be closest to my view of how these situations should be handled, I join today's opinion both because I do not find it varies too much from the *Martinez Chavez* standard and because of the advantageousness of our court finally reaching consensus in this important area.").

### C. The State's Harmless Error Argument

■ The State argues that any *Caldwell* error was rendered harmless because the judge, not the jury, makes the sentencing decision under Indiana law. The Supreme Court of Indiana has at least implicitly rejected that position every time it has decided *Caldwell* arguments on their mer-

its. The State's argument also is not consistent with the decisions of the Eleventh Circuit applying *Caldwell* to cases arising from Florida and Alabama. Precisely because Indiana law requires the sentencing judge to give some substantial degree of attention to the jury's recommendation— because the jury recommendation is presumed to influence, though not control, the judge's decision—a true *Caldwell* error in an Indiana case cannot be treated as harmless simply because the jury's role is to make a recommendation to the trial judge.

### D. Applying the Principles of Caldwell v. Mississippi

■ The issue here is not whether the trial judge correctly anticipated all the nuances later stated by the Supreme Court of Indiana concerning the role of the jury's sentencing recommendation. The State court has a vital supervisory power over the State's trial courts and has used that power over the years to tell the trial courts how better to communicate that role to juries. The issue under *Caldwell,* as applied to a recommendation statute, is whether the judge's decision to sentence Fleenor to death was influenced by a jury that had been misled to believe that its role in sentencing was less important than it actually was.

The jury was entitled to know that its decision would be a recommendation. The trial judge correctly instructed the jury about that. The last word the jury heard on the subject came in the judge's final instructions at the penalty phase, which is the word likely to have the greatest weight and credibility with the jury. Those instructions correctly told the jury that its decision was a recommendation and not a binding decision, but that its recommendation would be a "very valuable contribution" to the judge's decision. At that time, as the Supreme Court of Indiana pointed out, the jury could not have been under the impression that its role in the process was minor or trivial. The jury had heard

all the evidence as to guilt and had rendered a verdict of guilty. The jurors then returned to hear more evidence and powerful arguments about the appropriate penalty in the case. Then–Justice Rehnquist's comments in dissent in *Caldwell* itself have more force here, under a recommendation statute, than they had in *Caldwell:*

> Indeed, under the circumstances here the importance of the jury's role could hardly have been lost on the jurors themselves. The charge at the guilt phase highlighted the jurors' role as factfinders and their duty to follow the law in reaching their conclusions. The importance of their role at sentencing was evident from the charge, from the impassioned plea for mercy from petitioner's counsel, petitioner, and petitioner's mother, as well as from the prosecutor's rebuttal. It is indeed difficult to agree with the Court that a group subjected to all this attention nevertheless interpreted a few remarks by the prosecutor to mean that the group's decision was no more than a sideshow—a mere "preliminary step" toward the ultimate sentencing determination.

472 U.S. at 349, 105 S.Ct. 2633 (Rehnquist, J., dissenting). Accord, *Davis v. Singletary,* 119 F.3d 1471, 1482 (11th Cir.1997) (remarks about role of jury's recommendation must be considered "in the context of the entire trial"); *Waters v. Thomas,* 46 F.3d 1506, 1524 (11th Cir.1995) (*en banc*) (remarks about jury's role under jury sentencing statute must be considered in context).

The same circumstances were present here to show the jury that its role was vital, yet less decisive than the jury's role in *Caldwell.* While a more forceful affirmation of the importance of the jury's role in this case might have been desirable, as the Supreme Court of Indiana observed, the fact that this aspect of the case might have been handled in a better way does not mean that the result was unconstitutional. The difference between optimal

treatment of the issue—which the Supreme Court of Indiana sought to promote in its comments in this case—and the sum of the treatment here does not amount to a violation of Fleenor's constitutional rights. See *Caldwell,* 472 U.S. at 350–51, 105 S.Ct. 2633 ("Although the Eighth Amendment requires certain processes designed to prevent the arbitrary imposition of capital punishment, it does not follow that every proceeding that strays from the optimum is *ipso facto* constitutionally unreliable. *Zant* and *Barclay* hold as much.") (Rehnquist, J., dissenting), citing *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), and *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983) (plurality opinion). The jury knew it was making a recommendation, and it knew its recommendation was an important part of the process. To put it another way, the difference between an instruction that the judge would give "due consideration" to the jury's recommendation, as suggested by the Supreme Court of Indiana in this case, and the trial judge's actual instruction that the jury's recommendation would be a "very valuable contribution to the court's decision-making process" does not rise to the level of an Eighth Amendment violation.

Fleenor has focused attention on the trial judge's comments in voir dire to the effect that he could "ignore" the jury's recommendation. In explaining to many prospective jurors their role and the fact that any verdict about the sentence would be a recommendation, the judge said that he could "accept" it or "ignore" it. At that point the judge was trying to introduce prospective jurors to the basic point that their role at sentencing would be to make a recommendation. At that phase of the trial the judge was not trying to explain the nuances of how the jury's recommendation might figure in his own decision. In context, the dichotomy in the voir dire between "accept" and "ignore" clearly meant "follow" or "not follow." By the time of the penalty phase, however, the

jurors had already heard weeks of testimony, had deliberated and rendered guilty verdicts, and had heard additional evidence and argument on the appropriate penalty in the case. By the time the judge told the jury that their recommendation would be a "very valuable contribution" to the court's decision-making process, nobody in the courtroom could seriously have expected the judge literally to "ignore" the jury recommendation. He could certainly disagree, as he told the jury, but he could not ignore the recommendation, nor is there any indication that he did so. Overall, this aspect of trial "would have been better," as the Supreme Court of Indiana put it, if the judge had done more to stress the importance of the jury's recommendation, but the treatment of the issue did not violate the Eighth Amendment as interpreted in *Caldwell*.[5]

## II. *EFFECTIVE ASSISTANCE OF COUNSEL REGARDING MITIGATION EVIDENCE AT THE PENALTY PHASE*

The defense reasonably conceded at the penalty phase of the trial that all three of the alleged statutory aggravating factors had been proven beyond a reasonable doubt. Fleenor committed the murders by lying in wait, he intentionally committed more than one murder, and he intentionally committed murder while committing the crime of burglary. See Ind.Code § 35–50–2–9(b); 16 TR 4998 (defense argument at penalty phase). The defense sought to show that several mitigating factors were present in Fleenor's case. It is a mitigating factor under Indiana law that the defendant was "under the influence of extreme mental or emotional disturbance when he committed the murder." It is also a mitigating factor that "the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication." Indiana law also allows the jury to consider any other circumstances appropriate for mitigation. See Ind.Code § 35–50–2–9(c). Fleenor argues that in handling the mitigation evidence and arguments, his lawyers failed to provide the effective assistance of counsel required by the Sixth Amendment to the

**5.** One commentator has argued that these sentencing systems in which an accurate description of roles would suggest that both the judge and the jury bear only partial responsibility for the sentence of death are *per se* inconsistent with the principle of *Caldwell*: "[B]oth judge and jury could look to the other as the decisionmaker responsible for making the hard choices—with neither ever doing so. When responsibility for a death sentence is divided, there exists the danger—identified in *Caldwell* as constitutionally intolerable—that no one bears the ultimate responsibility for this critical decision." Mello, *Taking Caldwell v. Mississippi Seriously: The Unconstitutionality of Capital Statutes that Divide Sentencing Responsibility Between Judge and Jury*, 30 B.C.L.Rev. 283, 286 (1989). Another commentator, responding to empirical research on jurors in capital cases in Indiana, has proposed that the rule of *Caldwell* be reformulated so as not merely to prohibit giving the jury certain misleading information, but also to impose on the trial court a duty to give the jury "strong, unequivocal, affirmative instructions stating that the personal moral responsibility for the death sentencing decision

rests with each and every one of them." Joseph L. Hoffmann, *Where's the Buck?—Juror Misperception of Sentencing Responsibility in Death Penalty Cases*, 70 Ind.L.J. 1137, 1138–39 (1995). Based on the empirical studies of capital juries, Professor Hoffmann argued that this rule should "recognize that jurors are predisposed to use almost *any* available information to downplay their responsibility for the death sentencing decision—including information that accurately describes the sentencing process." *Id.* at 1138 (emphasis in original).

In view of the fact that the Supreme Court of the United States has approved the constitutionality of jury-recommendation statutes, see *Proffitt v. Florida*, 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the lower federal courts are not in a position to adopt the *per se* rule argued in the Mello article. Whether Professor Hoffmann's argument is adopted as a constitutional rule, it now seems apparent that the better practice would be his approach of "strong, unequivocal, affirmative instructions stating that the personal moral responsibility for the death penalty" rests with each juror.

United States Constitution at the penalty phase of the trial.

Two lawyers represented Fleenor before and during his trial—Ted Todd of Jefferson County and Larry Combs of Johnson County. Both were skilled and experienced trial lawyers. Todd had been practicing law for 18 years and Combs had been practicing for about ten years. Both had represented defendants in several murder cases before, including one murder case in which the two had worked together as the defense team, but neither Todd nor Combs had tried a death penalty case before this one. Todd testified at the post-conviction hearing that he had spent more than 500 hours on the case and that Combs had spent close to the same amount. Todd's testimony also shows, as is evident from the trial transcript, that he and Combs thoughtfully evaluated their trial strategy in an effort to save Fleenor's life if they could. They did not try to deny that Fleenor shot and killed Bill Harlow and Nyla Jean Harlow. They did try to give the jury evidence as to why he might have done so, and they argued passionately and eloquently against imposing the death penalty.

## A. The Evidence Presented to the Jury

Upon motion of the prosecution the court accepted for the record of the penalty phase all of the evidence from the guilt-innocence phase. The prosecution presented no additional penalty evidence of its own. Fleenor's trial lawyers presented evidence to build on their efforts in the guilt-innocence phase to show that Fleenor was not of a normal mind, that the murders were the product, at least in part, of mental illness, extreme mental or emotional disturbance, and/or the effects of alcohol. They also presented evidence of Fleenor's limited intelligence and troubled childhood. The evidence from the guilt-innocence phase of the trial included the testimony from Fleenor himself. It also included two court-appointed psychiatrists, Dr. Gordon Brown and Dr. Fitzgerald,

who testified that Fleenor was not legally insane but was suffering from a recognized personality disorder. The testimony included testimony from a psychologist selected by defense counsel, Dr. Paul Campbell, concerning his diagnosis of Fleenor as having antisocial personality disorder and borderline personality disorder, his suggestion of the possibility that the murders occurred as part of a "transient psychotic episode" occasioned by emotional stress, as well as the possibility that Fleenor had some organic brain damage. 14 TR 4325–72.

The additional defense evidence in the penalty phase included testimony from two clergymen, one of whom had known Fleenor for years, about Fleenor's background, his remorse, and his prospects for life in prison. Dr. Robert Keller, then a member of the State Board of Correction with a doctorate in sociology and special training and experience in counseling alcoholics, testified about the effects of long term abuse of alcohol upon the mind. Sandra Sedam—Fleenor's ex-wife and the daughter of the Harlows—also testified that she thought Fleenor was under extreme mental or emotional disturbance when he murdered her parents in front of her and the children. She testified about the effects of alcohol on Fleenor. She testified that she did not want him to die for his crime. She also testified that she believed that the death penalty would be contrary to her murdered parents' religious beliefs. Fleenor's brother-in-law testified about Fleenor's kindness toward children and his background, as well as the effects of alcohol upon him. Fleenor's mother testified about the effects of alcohol upon him, and she begged the jury not to kill her son.

During the presentation of the mitigation evidence, however, the prosecution used its opportunities for cross-examination to undermine the weight of that evidence and to emphasize facts that tended to support imposition of the death penalty. In rebutting the defense reliance on the effects of alcohol, the prosecution pointed

out in cross-examination that on the day of the murders, Fleenor had had only three or four beers and part of a marijuana joint, and that he had not appeared intoxicated in earlier encounters with Sandra Sedam and Nyla Jean Harlow, with his friends, or at the Harlows' church. The prosecution also pointed out during cross-examination of Sandra Sedam that the shot that killed Nyla Jean Harlow was an accurate pistol shot from across the room into the top of her head as she knelt over the wounded Bill Harlow. The prosecution also pointed out through Sandra Sedam's testimony that Fleenor retained the ability. to plan his escape from Indiana using Sandra and her family as hostages. See 15 TR 4714–17. In cross-examining both clergymen, the prosecution reminded the jury that Dr. Gordon Brown had expressed the opinion that, if given the chance in the future, Fleenor would "continue to involve himself in similar behavior in the future." (That cross-examination is the subject of Part VIII, below.) In cross-examining Father Duff Green, who had praised Fleenor's concern for Sandra's son Justin, the prosecution reminded the jury that Fleenor himself had threatened to kill Justin the night of the murders. 16 TR 4757. In cross-examining Sandra and Fleenor's brother-in-law Earl Lacy, the prosecution also reminded the jury that Fleenor had tried to escape from the Jefferson County jail and had told his girlfriend that he was ready to kill the police dispatcher if necessary to accomplish the escape. 16 TR 4758, 4931.

The trial court allowed the defense to put on evidence through Dr. Keller that the death penalty does not have a deterrent effect generally in society. The prosecution used its cross-examination, however, to point out that Fleenor himself had not been aware that he might be subject to the death penalty, and that he had told a friend the night before the murders that he would be spending the rest of his life in prison. In closing arguments, the prosecution used this evidence to argue that Fleenor had tried to make his own "plea bargain" before he committed the murders: he had decided to kill and he expected a life sentence in return. Then, when he learned after his arrest that he might be subject to the death penalty, he plotted an escape from the jail even if it might require an additional murder. This evidence about Fleenor in particular was obviously relevant in response to the defense argument against any more general deterrent effect from the death penalty. It also weighed against the argument that he acted under the influence of extreme emotional or mental disturbance. During the cross-examination of Dr. Keller after the jury's questions had been asked, the prosecution also reminded the jury that an EEG of Fleenor had been normal. 16 TR 4911.[6]

B. *The Additional Evidence Offered After Trial*

In the state post-conviction relief proceeding and in this court, Fleenor has identified additional evidence that he contends would have supported his arguments for mitigation. He argues that his trial counsel were ineffective for purposes of the Sixth Amendment because they failed to pursue and present the additional evidence. First, Fleenor contends that his trial counsel should have cross-examined the two court-appointed psychiatrists at trial, Dr. Gordon Brown and Dr. Joseph Fitzgerald, about the presence of evidence of extreme mental and emotional disturbance and about the fact that they did not examine Fleenor for brain damage. See PC 1286–1328 (Brown); PC 1343–62 (Fitzgerald). Second, Fleenor offered at the post-conviction hearing testimony from Dr. James E. Dugas, Ph.D., an expert in psychopharmacology, to testify about the effects of drugs on thinking and behavior and how drug and alcohol abuse

6. During the penalty phase, the trial court permitted jurors to question Dr. Keller by submitting written questions that the court then posed to the witness. See 16 TR 4888–98.

could cause Fleenor to suffer blackouts and toxic psychosis. See PC 1672–1721. Fleenor argues that this testimony would have been more appropriate on these issues than the testimony of Dr. Keller. Third, Fleenor argues that his lawyers should have presented the testimony of Dr. Stewart "to explain and challenge Dr. Brown's and Dr. Fitzgerald's testimony that Petitioner simply had an antisocial personality disorder." See PC 1590–1671. Fourth, Fleenor argues that his lawyers should have more thoroughly investigated evidence of his "traumatic childhood," especially with testimony corroborating Fleenor's own testimony. Fleenor now contends this evidence should have included testimony from his aunt, who saw Fleenor as a toddler whipped by his stepfather for no apparent reason; from another family member who saw Fleenor as an eight year old whipped by his stepfather with a belt; and from two other witnesses about Fleenor's treatment by his family and his troubled relationship with his father. Fifth, Fleenor argues that his lawyers should have presented testimony about his difficulties in school, including the lack of psychological evaluations and special education programs in the school. Sixth, Fleenor argues that his lawyers should have obtained and offered testimony from a neuropsychologist and/or a neurologist to show frontal lobe brain damage that resulted in "disinhibition or poor impulse control in addition to neurocognitive deficits and dysfunction that impaired Petitioner's reason, judgment and problem solving ability." In support of this sixth point, Fleenor relies on evidence not presented to the state courts in the postconviction proceeding. This evidence is set forth in Exhibits D, E, F, and G attached to Fleenor's petition for a writ of habeas corpus, and requires separate treatment below.

### C. *The Constitutional Test for Effective Assistance of Counsel*

The controlling legal standards for effectiveness of counsel were set forth by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Court said:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687, 104 S.Ct. 2052. Under the first prong of this test, the Court in *Strickland* adopted an objective standard of "reasonableness under prevailing professional norms" for counsel's performance. *Id.* at 688, 104 S.Ct. 2052. The Court declined to be more specific or to lay out a checklist for such inquiries. The Court stressed, however, that judicial scrutiny of counsel's performance must be "highly deferential," and it warned against the temptation to second-guess counsel's performance after an unsuccessful result. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." *Id.* at 689, 104 S.Ct. 2052. The focus must be on the attorney's role in the adversarial process that is central to confidence in the fairness and reliability of the judicial process.

As applied to the penalty phase of a capital trial, the Seventh Circuit has explained that this standard means:

> Viewing the performance of counsel solely from the perspective of strategic competence, *we hold that defense coun-*

*sel must make a significant effort, based on reasonable investigation and logical argument, to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors.* Mitigating factors brought out at trial might be emphasized, a coherent plea for mercy might be given, or new evidence in mitigation might be presented. But counsel may not treat the sentencing phase as nothing more than a mere postscript to the trial. While the *Strickland* threshold of professional competence is admittedly low, the defendant's life hangs in the balance at a capital sentencing hearing. Indeed, in some cases, this may be the stage of the proceedings where counsel can do his or her client the most good.

*Kubat v. Thieret,* 867 F.2d 351, 369 (7th Cir.1989) (emphasis added) (holding counsel's performance was ineffective where counsel failed to present any evidence in mitigation and offered a rambling and incoherent argument "that cannot, even charitably, be called a plea for mercy").

What does the general statement about counsel's duty at sentencing—"a significant effort, based on reasonable investigation and logical argument"—mean with respect to possible evidence of mental illness or related problems? The Seventh Circuit addressed the problem but did not try to resolve it in *Stewart v. Gramley,* 74 F.3d 132, 135 (7th Cir.1996). The court commented:

> Presumably the lawyer is not required to investigate the defendant's past with the thoroughness of a biographer. The resources of defense lawyers are limited and they have only a short time to prepare for the sentencing hearing. Sometimes it will be apparent from the evidence concerning the circumstances of the crime, from conversation with the defendant, or from other sources of information not requiring fresh investigation, that the defendant has some mental or other condition that will repay further investigation, and then the failure to in-

vestigate will be ineffective assistance. *Brewer v. Aiken,* 935 F.2d 850, 857–58 (7th Cir.1991); *Antwine v. Delo,* 54 F.3d 1357, 1365–68 (8th Cir.1995). In other cases, where these indications are lacking, counsel may "reasonably surmise from his conversations with [the defendant] that character and psychological evidence would be of little help." *Strickland v. Washington, supra,* 466 U.S. at 698, 104 S.Ct. 2052; see also *Waters v. Thomas,* 46 F.3d 1506, 1510–18 (11th Cir.1995) (en banc); *Bolender v. Singletary,* 16 F.3d 1547, 1557 (11th Cir. 1994); *Francis v. Dugger,* 908 F.2d 696, 703 (11th Cir.1990).

74 F.3d at 135. The *Stewart* court did not try to answer the question definitively because any supposed failure to investigate more thoroughly in that case was not prejudicial to the defendant. *Id.* at 136–37.

Other cases involving asserted failures to provide effective assistance with respect to possible mitigating evidence of a defendant's mental illness or brain damage provide more specific guideposts for resolving the question here. In *Eddmonds v. Peters,* 93 F.3d 1307 (7th Cir. 1996), two judges concluded that defense counsel had failed to provide effective assistance at sentencing by failing to pursue and present evidence of the defendant's long history of mental and psychiatric problems. (All three judges concluded, however, that any failure was not prejudicial under the second prong of *Strickland.* See 93 F.3d at 1323 (Flaum, J., and Rovner, J., concurring).) The defendant in *Eddmonds* had been examined more than ten times before trial to determine his competency to stand trial, and the earliest examinations had concluded that he was not competent. Four of the psychiatric reports diagnosed some form of schizophrenia while others diagnosed borderline and antisocial personality disorders with depressive features. Defense counsel also possessed evidence of an earlier diagnosis of schizophrenia and a three month stay in a psychiatric hospital, as well as at-

tempted suicides and self-mutilation. Judge Flaum wrote:

> Thus even a cursory review of Eddmonds' file would have revealed long-standing, complex, and often severe mental problems. Such a well-documented mental health history would undoubtedly alert the committed attorney to the existence of possible mitigation evidence and clearly invoke the duty of reasonable investigation. We and other circuits have found a duty to inquire further with much less abundant and consistent documentation of mental illness. See, e.g., Brewer v. Aiken, 935 F.2d 850, 857–58 (7th Cir.1991); Antwine v. Delo, 54 F.3d 1357, 1367 (8th Cir.1995); Hill v. Lockhart, 28 F.3d 832, 845 (8th Cir.1994); Stephens v. Kemp, 846 F.2d 642, 652–53 (11th Cir.1988).

93 F.3d at 1324 (Flaum, J., concurring). The defense counsel who had this information could not recall taking any investigative steps before the penalty hearing. He did not ask any mental health expert to examine Eddmonds, nor did he ask those who had already examined him to evaluate him for purposes of the penalty hearing. He did ask one psychiatrist to testify, but he did nothing to prepare the psychiatrist for testimony (by providing, for example, more recent reports by other experts). After that psychiatrist was severely undermined on cross-examination, counsel failed to use available materials to support and rehabilitate his testimony. 93 F.3d at 1326–27. The two concurring judges found that counsel's failure to investigate the available psychiatric evidence and to present what little he did have in an effective way fell short of the Strickland standard for effectiveness as applied to the case. Id. The fact that two psychiatrists had determined that Eddmonds was sane did not make the lawyer's performance more acceptable because of the different standards applicable to the insanity defense and mitigation at sentencing, and because of the volume of evidence showing serious psychological problems. Id. at 1324–25.

Similar failures to pursue psychological evidence were decisive in cases cited in Eddmonds and Stewart. In Brewer v. Aiken, 935 F.2d 850 (7th Cir.1991), the Seventh Circuit affirmed a district court judgment vacating an Indiana death sentence. The defense lawyer had treated the penalty phase of the trial almost as an afterthought for which he did not prepare. A "cursory investigation" of the defendant's mental history would have shown that he received shock therapy as a child, suffered brain damage from blows as a child, was classified as having such low intelligence as to be "mentally defective," and had been evaluated as having a level of psychological development that left him very dependent, infantile, and unable to control his impulses. 935 F.2d at 857–58. The defense counsel did not investigate this record at all. The failure fell short of an objective standard of reasonableness. Id. at 858.

In Antwine v. Delo, 54 F.3d 1357 (8th Cir.1995), a "cursory mental examination" given four months after the offense found that the defendant's behavior at the time of the offense was abnormal but consistent with PCP intoxication. The defendant had admitted PCP use at other times but denied having taken PCP at the time of the murder. The Eighth Circuit held that counsel's failure to seek a second mental examination in the face of this inconsistency was not a "strategic choice" and fell short of the Strickland standard. 54 F.3d at 1367–68. Similarly, in Hill v. Lockhart, 28 F.3d 832 (8th Cir.1994), the defense counsel was aware of a psychiatric hospitalization of the defendant. Counsel failed to obtain records showing that the defendant had a positive response to anti-psychotic drugs but that failure to take the drugs caused him to regress to a psychotic state. There was also evidence indicating that he had stopped taking his medication several weeks before the murder. His counsel had attempted to present an insanity defense at the guilt phase, but had

done so without credible and well-documented evidence, and instead had presented an insanity defense that was "barely believable at best and, even worse, not documented by Mr. Hill's medical history." 28 F.3d at 843. The Eighth Circuit vacated the death penalty based on the ineffective assistance of counsel. 28 F.3d at 845–47.

The Eleventh Circuit's decision in *Stephens v. Kemp*, 846 F.2d 642 (11th Cir. 1988), is also instructive. After the defendant was charged with murder, the trial court had ordered a psychiatric evaluation, which resulted in a finding of no severe mental illness at that time or in the recent past, but the report showed that the defendant had reported a stay in a mental hospital four to six months earlier and was vague about why he was hospitalized. The defendant's sister had also told counsel about the recent hospital stay. The Eleventh Circuit held that counsel's failure to investigate that stay or to seek any additional psychological evidence fell short of effective assistance of counsel under *Strickland*. 846 F.2d at 653–55.

Cases from the other side of the line between effective and ineffective assistance are also instructive, including the facts of *Strickland* itself. The defendant had committed three murders during a ten-day period that also involved torture, kidnapping, severe assaults, attempted murders, attempted extortion, and theft. He admitted the three murders, pled guilty, and waived his right to an advisory jury on the death penalty. To prepare for sentencing, his lawyer spoke with him about his background and spoke by telephone with his wife and mother. He did not seek out other character witnesses. The lawyer saw no indication of psychological problems and did not seek psychiatric evaluation. He decided not to present and therefore not to look for evidence about the defendant's character and emotional state. The lawyer chose to rely on the plea colloquy on these subjects and not to present new evidence because that approach would not provide an opportunity for cross-examination of the defendant or for the prosecution to put on its own psychiatric evidence. The lawyer focused his argument at sentencing on the defendant's admission of guilt and argued that he "was fundamentally a good person who had briefly gone badly wrong in extremely stressful circumstances." See 466 U.S. at 673–74, 104 S.Ct. 2052. The effort was unsuccessful. The trial judge sentenced the defendant to death. The Supreme Court illustrated the general principles it had announced by holding that the lawyer's performance involved strategy choices "well within the range of professionally reasonable judgments, and the decision not to seek more character or psychological evidence than was already in hand was likewise reasonable." *Id.* at 699, 104 S.Ct. 2052. The Court made clear that it believed the question of counsel's performance was not a difficult one on the facts presented. *Id.*

In *O'Neal v. Delo*, 44 F.3d 655 (8th Cir.1995), the defendant was a prison inmate who killed another inmate. Defense counsel arranged for a psychiatric examination that concluded the defendant was "basically free of psychotic illness" at the time of the killing. The psychiatrist recommended further tests "only to rule out 'the remote possibility of a progressive organic brain disease.'" 44 F.3d at 659. Counsel sought a second evaluation but his request was denied. At trial, the defendant assisted in his defense, and he testified and claimed that he acted in self-defense. On that record, the Eighth Circuit found that counsel's approach was reasonable. *Id.* at 660.

In *Waters v. Thomas*, 46 F.3d 1506 (11th Cir.1995) (*en banc*), the defendant attempted at the guilt phase of the trial to establish an insanity defense by calling six mental health experts who had treated or examined the defendant. None of the experts provided an opinion that would have supported an insanity defense, but they all testified that the defendant suffered from

some form of mental illness and that he had been under active treatment for schizophrenia for at least four years before the murders. See 46 F.3d at 1513 (summarizing testimony). The insanity defense was unsuccessful; the prosecution and defense did not present additional evidence at sentencing and instead used the evidence from the guilt phase of the trial. During the collateral review, new lawyers for the defendant came forward with affidavits from some of the earlier defense witnesses about additional points they could have made at the trial if asked. The Eleventh Circuit was careful to point out that the test of effectiveness is not a simple quantitative test:

> The lesson to be drawn from our decisions is not that counsel's performance is always, or even usually, deficient if counsel fails to present available mitigating circumstance evidence. Nor is the lesson that the presentation of some mitigating circumstance evidence will always insulate counsel's performance from being condemned as ineffective. Instead, our decisions teach that whether counsel's performance is constitutionally deficient depends upon the totality of the circumstances viewed through a lens shaped by the rules and presumptions set down in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and its progeny.

46 F.3d at 1511. The Eleventh Circuit pointed out, however, that it was not aware of any decisions finding that counsel who had presented a comparable quantity of evidence about the defendant's mental state was ineffective for failing to present more. *Id.* at 1513.

D. *Applying the Strickland Standard to the Additional Evidence*

▮ Fleenor has not shown that the performance of his trial counsel in any respect fell below the constitutional standard of effectiveness under *Strickland.* First, his lawyers did not fail to meet professional standards of effectiveness by failing to do additional cross-examination of Dr. Brown or Dr. Fitzgerald. The record at trial shows that attorneys Todd and Combs focused immediately on issues of mental health and explored the possibility of a true insanity defense. The two court-appointed psychiatrists examined Fleenor, as did one psychologist selected by the defense. Fleenor's lawyers knew that none of these three experts who examined Fleenor would opine that he was insane.[7] His lawyers therefore focused on trying to persuade the jury that Fleenor was "guilty but mentally ill" under Indiana law at the guilt phase. They were not successful in that effort, but they could use and did use the evidence from Drs. Brown, Fitzgerald, and Campbell to argue to the jury that Fleenor's ability to conform his conduct to the requirements of law was substantially impaired by mental disease or intoxication. The effort by Fleenor's lawyers to develop and present evidence of his mental condition went well beyond any effort found ineffective in any case brought to the attention of the court. Their effort was well within the bounds of professional reasonableness. The fact that Fleenor's later lawyers, acting without the constraints of time and resources faced by the trial attorneys, have been able to identify additional steps that could have been taken does not come close to establishing ineffectiveness.

Fleenor's trial counsel also did not fail to meet professional standards of effectiveness by calling as a witness on alcohol-related issues Dr. Keller instead of Dr. Dugas, who testified at the post-conviction proceeding. Dr. Keller was attacked on cross-examination for his lack of a medical background for purposes of addressing the chemical aspects of alcohol addiction. See 16 TR 4862–63. At the same time, Dr.

---

7. In addition, at the very outset of the case, the Jefferson Circuit Court had appointed two psychiatrists from the Madison State Hospital to examine Fleenor as to his sanity and his competence to stand trial. They reported to the court their opinion that Fleenor was not insane and was competent to stand trial. 1 TR 16, 22.

Keller brought to the case a broad familiarity with the role of alcohol in criminal activity and the potential persuasive weight of being a member of the State Board of Correction. In addition, the evidence that Fleenor was actually substantially impaired by alcohol at the time of the murders was less than compelling. As noted above, several witnesses who saw Fleenor that day denied seeing signs of intoxication, and in carrying out the murders and planning his escape with his family, Fleenor did not act as if he were intoxicated or impaired. Fleenor's argument on this point relies on exactly the sort of 20–20 hindsight that *Strickland* warned against.

Fleenor's trial counsel also did not fail to meet professional standards of effectiveness by failing to call Dr. Stephen Stewart, a psychologist who testified at the post-conviction hearing, or anyone else who might have provided similar testimony. See PC 1590–1671. Dr. Stewart disagreed with the primary diagnosis of the two court-appointed psychiatrists and the defense's Dr. Campbell. In essence, Dr. Stewart would have provided stronger support for the mitigating factor of extreme mental or emotional disturbance. However, all three experts who had examined and diagnosed Fleenor at the time of trial agreed that he was legally sane at the time of the murders. The legal standard for insanity is much more stringent, of course, than the standard for mitigation evidence, but all three provided some material that could be used and was used by the defense to argue in mitigation. Professional standards of effectiveness do not require a defense lawyer to keep looking for more expert witnesses indefinitely until he finds one who provides the desired diagnosis. The fact that more evidence might have been developed does not mean that counsel were ineffective.

Fleenor's trial counsel also did not fail to meet professional standards of effectiveness by failing to present more evidence of Fleenor's childhood and family life. The trial lawyers interviewed several family members and presented testimony tending to show a troubled childhood in terms of physical abuse. At the post-conviction hearing Fleenor presented evidence tending to show that more could have been presented if the lawyers had interviewed more family members. This is not a case, however, where the trial counsel ignored or failed to pursue reasonable leads or an entire area of potential mitigating evidence. As Larry Combs testified in the post-conviction proceeding, time, money, and manpower were not unlimited. PC 1764. The trial lawyers' investigative efforts did not equal the state of the mitigation art as it has evolved in the 1990s, but that is a far cry from failing to provide the assistance of counsel guaranteed by the Sixth Amendment. In addition, it is worth keeping in mind that the prosecution was able to use the testimony of family members to remind the jury of Fleenor's earlier violence and the attempted escape from jail. See 16 TR 4929–32 (cross-examination of Earl Lacy about Fleenor's beatings of Sandra Sedam and escape attempt). Also, Fleenor's half-brother, Michael King, testified on cross-examination that Fleenor had had a "normal" family life. More testimony like this would not necessarily have been better for the defense.

Fleenor's defense counsel also did not fail to meet professional standards by failing to call Dan Waterfill to testify about Fleenor's schooling. His testimony might have added a little mitigation evidence, but again, the fact that more might have been offered does not mean that counsel were ineffective.

### E. *The Evidence of Possible Organic Brain Damage*

The additional evidence tending to support mitigation that was presented to the state courts through the post-conviction relief proceeding does not show that Fleenor's trial counsel failed to meet professional standards of effectiveness under the first prong of the *Strickland* analysis. In

support of his petition for a writ of habeas corpus, Fleenor has also submitted Exhibits D, E, F, and G. Because this evidence was not offered in the state post-conviction proceeding, it requires separate treatment here. Exhibit D is an affidavit from Michael M. Gelbort, Ph.D., a clinical psychologist. Dr. Gelbort reviewed a number of the records of psychological testing and evaluations of Fleenor. He states that at the time of Fleenor's trial, "neuropsychological testing was indicated and necessary to assess the patient's neurocognitive integrity." Ex. D at 2. Dr. Gelbort states that several specific diagnostic tests should have been conducted and that a mental status examination should have been done. He concludes: "With these tests, a more accurate assessment can be made as to whether the petitioner suffers from brain dysfunction reflecting brain damage which could affect the patient's behavior and whether further examination and/or testing is indicated by the results of these tests." Ex. D. at 2. The affidavit was signed May 8, 1994.

Exhibit E is a report by Dr. Gelbort of a neuropsychological evaluation of Fleenor that he conducted in August 1994. He reported his impressions at page 3:

Mr. D.H. Fleenor is a forty-two year old right-handed white male who is involved in post-conviction proceedings in a capital murder case. The patient has a history of significant alcohol abuse with reported blackouts and possible D.T.s, as well as polydrug abuse including [inhalants]. He has also been hospitalized for multiple traumatic brain injuries and suffered a shotgun blast to the head resulting in loss of his left eye and the presence of metal fragments in his head. These injuries are highly correlated with causation of neurocognitive deficits and dysfunction and predate the capital murder charges.

Testing found a notable differential between Verbal and Performance IQs with verbal reasoning deficits observable. Information processing speed was slowed and cognitive efficiency was impaired leading to deficits in problem solving and reasoning. Judgement was also detrimentally affected.

Tests of visual learning and memory showed relative and absolute impairments. Measures of complex sensory perceptual functioning showed a similar pattern of dysfunction. Measures of higher cognitive abilities found impaired abilities consistent with disinhibition and brain dysfunction affecting executive functions.

These deficits are judged to be of long-standing duration and lead to impaired reasoning, inhibition, judgement, and problem-solving abilities. Evidence supports, to a reasonable degree of neuropsychological certainty, that the deficits were present at the time of the offense and would have had a detrimental affect [sic] on the patient's ability to demonstrate normal reasoning, judgement, and inhibition of undesirable behaviors at the time.

Exhibit F is an affidavit from James Paul Kelly, M.D., a neurologist who directs the brain injury program at the Rehabilitation Institute of Chicago and serves on the faculty of Northwestern University Medical School. Dr. Kelly has not examined Fleenor, but he states that he has read Dr. Gelbort's report and finds that it offers "substantial evidence of traumatic brain injury based on neuropsychological deficits." Dr. Kelly also states that neuropsychological testing is the best way to measure the effects of "mild mechanical injuries to the brain," that Fleenor's history of loss of consciousness on more than one occasion supports the diagnosis of traumatic brain injury, that Dr. Gelbort reports "evidence of disinhibition consistent with frontal lobe brain injury," and that "impulse control is frequently lost after traumatic brain injury of the type described in Dr. Gelbort's report."

Exhibit G is a page of handwritten notes by Fleenor's trial counsel. The notes show "Kay Pitzuhel—neurological psychol-

ogist at I.U. Indianapolis," with another note "neuropsychological workup."[8] The notes also say "EEG—possible workup," and "EEG—If person has brain injury, & has blackout claims, likely under [heightened] emotional stress? Could be frontal lobe damage from gunshot wound."

Fleenor argues that his trial lawyers were ineffective at the penalty phase because they failed to pursue this avenue of inquiry into possible organic brain damage at the time of trial. The State has objected to any consideration of this new evidence, arguing that Fleenor had a full and fair opportunity in the state post-conviction proceeding to develop factual support for his claim that counsel were ineffective in dealing with mitigation issues. Fleenor does not contend that he has shown "cause" and "prejudice" for his failure to develop this evidence in the post-conviction proceeding. See *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 11–12, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). He argues, though, that this court has the discretion to consider the evidence that was not presented to the state courts. See *Pagan v. Keane*, 984 F.2d 61, 64 (2d Cir.1993), quoting *Townsend v. Sain*, 372 U.S. 293, 318, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) (district judge retains discretion to receive evidence bearing on petitioner's constitutional claim), and *Keeney v. Tamayo-Reyes*, 504 U.S. at 23, 112 S.Ct. 1715 (O'Connor, J., dissenting) (same, despite overruling of *Townsend* holding as to when evidentiary hearings are mandatory). In *Pagan* the Second Circuit instructed that district courts exercising this discretion should consider the existence of a factual dispute, the strength of the proffered evidence, the thoroughness of the prior proceedings, and the nature of the state court determination. 984 F.2d at 64.

In this case these factors weigh against exercise of the court's discretion to consider the new evidence. The proffered evidence provides support for the assertion that Fleenor may have suffered some organic brain damage that affected his ability to control his conduct. The court assumes for these purposes that the evidence is strong enough to withstand cross-examination. There is no evidence here of any deficiency in the state post-conviction proceeding. In that proceeding Fleenor was represented by his third set of capable and experienced lawyers. They had every opportunity and every incentive to develop the factual basis for Fleenor's claim that his trial lawyers were ineffective at the penalty phase. In addition, the factors that were considered by the Supreme Court in *Tamayo-Reyes*—concerns of finality, comity, judicial economy, and channeling the resolution of claims into the most appropriate forum—all weigh against considering new evidence that could have been presented to the state courts.

Most important, the new evidence adds little to the decisive performance prong under the *Strickland* standard for ineffective assistance of counsel. The court assumes for purposes of argument that Dr. Gelbort's and Dr. Kelly's opinions would suffice, after full development and cross-examination, to show at least some possibility of prejudice for purposes of the second prong of the *Strickland* test—i.e., that the judge might not have sentenced Fleenor to death if he and the jury had heard the evidence tending to show organic brain injury. As explained below, the new evidence does not strengthen Fleenor's argument on the performance prong.

To evaluate the performance of counsel for Sixth Amendment purposes, the relevant perspective is the time of trial, not afterwards when everyone knows that counsel did not succeed in avoiding the death penalty. See *Kokoraleis v. Gilmore*, 131 F.3d 692, 696 (7th Cir.1997) ("A trial may be adversarial and fair even if the chosen strategy goes awry. Because coun-

---

**8.** Fleenor's current counsel report that the reference apparently is to Kathleen (Kay) Fitzhugh–Bell, Ph.D., a neuropsychologist at Indiana University in Indianapolis. Dr. Fitzhugh–Bell did not conduct any testing of Fleenor.

sel cannot experiment with different strategies, it is difficult in both principle and practice to know how best to proceed."). At the time of trial, Fleenor's counsel had available a substantial amount of information concerning Fleenor's psychological condition.

Dr. Gordon Brown had examined Fleenor and had concluded that he was not insane or mentally ill, but that he had antisocial personality disorder. 14 TR 4468, 4481, 4487. Fleenor's counsel asked Dr. Brown whether he found any organic deficiencies or anything that would indicate organic brain deficiencies. Dr. Brown answered that he did not pursue that possibility. 14 TR 4493. When questioned later, during the post-conviction proceeding, Dr. Brown testified that he did not believe a neurological examination was warranted. PC 1328. Dr. Joseph Fitzgerald also examined Fleenor and concluded that he was not insane but also had symptoms of antisocial personality disorder. Dr. Fitzgerald did no neurological testing of Fleenor and did not make any referrals or recommendations for further examination.

Dr. Paul Campbell, a clinical psychologist, testified on behalf of the defense. Dr. Campbell examined Fleenor for four hours and administered a number of psychological and intelligence tests. He testified at trial to a dual diagnosis, antisocial personality disorder and borderline personality disorder. With respect to the legal definition of insanity, Dr. Campbell testified that he thought Fleenor could appreciate the wrongfulness of his conduct, and that it was only a "distinct possibility" that Fleenor lacked substantial capacity to conform his conduct to the requirements of law. 14 TR 4365. Dr. Campbell also opined, however, that Fleenor was "mentally ill" for purposes of the Indiana verdict of "guilty but mentally ill." 14 TR 4371–72. Dr. Campbell also testified that he had administered a test to Fleenor that is most frequently used to get some indication of the probability of brain disfunction. Most sig-

nificant for present purposes, he testified that Fleenor's test results were "better than I would have expected for an individual in his intellectual range." 14 TR 4332. On cross-examination he agreed that the result of that test, at least in and of itself, did not suggest disfunction in Fleenor's central nervous system. 14 TR 4352.

Fleenor testified at trial that he had no memory of the shootings or events surrounding them, and he had told Dr. Campbell the same thing. On cross-examination, Dr. Campbell was asked about possible explanations for that amnesia. The possibilities he mentioned were first that Fleenor might have been faking the amnesia, second that drug or alcohol consumption could have caused the amnesia, and third that the amnesia might be "related to the organic brain syndrome which I feel very well may be present" based on a history of blows to the head. 14 TR 4359–60. Dr. Campbell also suggested that the borderline personality disorder could, if Fleenor was under extreme stress, produce a transient psychotic state that might account for the amnesia. 14 TR 4360. Fleenor might also have experienced what Dr. Campbell called "emotional blocking" of events that were so painful to recall that the mind simply blocked the memory. 14 TR 4361.

Before trial, Fleenor's trial lawyers had petitioned the court for an order to conduct a brain scan of Fleenor using an EEG. 1 TR 163 (stating that counsel had conferred with psychologist and had reason to believe that test for brain damage would be helpful). The court granted that petition. See 1 TR 163, 165, 173–75, 179–82. The results apparently were normal, as the prosecution pointed out in cross-examining Dr. Keller during the penalty phase of the trial. 16 TR 4911.

The question presented by Fleenor's petition for a writ of habeas corpus is not whether he actually suffered from any organic brain disfunction or damage when he murdered the Harlows. The issue is whether, in light of all the circumstances

at the time, Fleenor's trial lawyers failed to meet professional standards of reasonableness by not pursuing further at that time the possibility of organic brain damage. The evidence in this record shows that counsel investigated Fleenor's mental status, received the results of two psychiatrists' examinations, arranged for Fleenor to be examined by a psychologist of their own choosing, and obtained an EEG examination. None of that evidence supported a defense of insanity. Only Dr. Campbell lent any support for a "guilty but mentally ill" verdict, and that support was thin. The EEG produced normal results, and none of the mental health experts recommended further testing for organic brain damage. Dr. Campbell thought organic brain damage remained a possibility, but he had done testing to look for brain damage and had found that Fleenor had done better than he expected.

In a world of limited time and resources, Sixth Amendment jurisprudence must recognize that counsel must be able to make a reasonable professional judgment that a well of potential evidence is likely to be dry. Fleenor's trial lawyers had extensive evidence concerning his mental health. That evidence offered some grounds for arguments in mitigation but was less than overwhelming. The lawyers also had additional lines of mitigation evidence, emphasizing the effects of alcohol on Fleenor, the family evidence, and the human potential for redemption. Based on the efforts made, and without the benefit of $^{20}\!/_{20}$ hindsight, Fleenor's lawyers made a reasonable professional judgment not to pursue the mental condition evidence further than they did. The comments of the Eleventh Circuit in *Waters* apply here:

> That other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of pri-

or counsel. As we have noted before, "in retrospect, one may always identify shortcomings," ... but perfection is not the standard of effective assistance.

46 F.3d at 1514, quoting *Cape v. Francis,* 741 F.2d 1287, 1302 (11th Cir.1984). Fleenor's lawyers undertook a substantial effort to develop defenses based on Fleenor's mental condition, and the results were not promising. In not drilling more deeply in that well, they did not fail to provide effective assistance of counsel.

The Seventh Circuit recently dealt with a very similar claim in *Burris v. Parke,* 116 F.3d 256 (7th Cir.1997), one of the many opinions dealing with Gary Burris, who was executed in November 1997. Burris argued that his trial lawyers in his (second) sentencing hearing were ineffective in part because they did not investigate the possibility that he suffered from organic brain damage. He argued that his trial lawyers should have suspected that a gunshot wound to his head in the 1970s had caused brain damage. The record showed that Burris had complained of headaches, but that two psychiatrists had examined Burris, had described the gunshot wound as superficial, and had concluded that Burris displayed "no indications of mental illness or deficiency." *Id.* at 259. Before the second sentencing proceeding, a psychologist had examined Burris and found no signs of brain damage or dysfunction. The Seventh Circuit majority found that there was no need for a hearing with evidence from a neuropsychologist as to the possibility of a brain injury contributing to the murder that Burris committed. 116 F.3d at 259–60. The majority also distinguished *Brewer v. Aiken,* 935 F.2d 850 (7th Cir.1991), because in that case both medical and lay observers had recognized severe mental impairment, but trial counsel never explored the subject and "put on essentially no defense." 116 F.3d at 260. The reasoning of *Burris* applies here. Fleenor's lawyers did not fail

to meet professional standards in representing him.[9]

The court has considered specifically all of the evidence that Fleenor contends shows that his trial lawyers failed to provide him with effective assistance at the penalty phase of the trial. The court is not persuaded that they failed to do so in any particular respect. Stepping back from the particulars, however, some additional observations are in order. A detailed review of the record shows that Fleenor's trial counsel put on a substantial case for mitigation and mercy. Unlike the lawyer in *Kubat*, who called no witnesses and whose argument was described as "a rambling, incoherent discourse ... that may actually have strengthened the jury's resolve to impose a death sentence," see 867 F.2d at 368, Fleenor's lawyers called family members, clergymen who knew Fleenor, and a sociologist familiar with alcoholism and its role in criminal behavior.

Fleenor's lawyers developed evidence to support three principal arguments. First, they tried to persuade the jury that Fleenor committed the murders under the influence of extreme mental or emotional disturbance based on his impending divorce, the expected loss of his wife and her son Justin, the loss of his job, and his belief that the Harlows had caused the impending divorce. Second, they tried to persuade the jury that Fleenor acted under the influence of alcohol so that either his capacity to understand the criminality of his conduct or his ability to conform his conduct to law was substantially impaired. Third, they were permitted to present wide-ranging evidence and argument on the role of mercy at this point in the justice system and whether the death penalty would be likely to have any deterrent effect. The testimony, especially that from Father Duff Green on cross-examination and redirect, included a lengthy discussion of the treatment of capital punishment in the Old and New Testaments and the views of many religious denominations large and small. As part of this more general attack on the death penalty as applied to this case, Fleenor's lawyers also tried to present him as a man with a troubled childhood who had never had many personal and social advantages shared by the jurors. They even managed to obtain testimony from Sandra Sedam against imposition of the death penalty and about her belief that her murdered mother and stepfather would not have wanted Fleenor executed. Fleenor's lawyers also presented a closing argument that appears, at least from reading the trial transcript, to have been a passionate and detailed argument in mitigation based on the evidence, as well as a plea for mercy.[10] Viewing the record as a whole, Fleenor received able, passionate, and effective representation from his trial lawyers. The fact that they were not successful, of course, does not undermine at all the constitutional sufficiency of their performance. They were trying to rebut a strong case for the death penalty, and it was of course

---

**9.** Judge Cudahy dissented and would have ordered an evidentiary hearing and the appointment of a neuropsychologist because Burris had not had a full and fair opportunity to litigate that issue in the state courts. 116 F.3d at 262 & n. 2. See also *Burris v. Parke,* 130 F.3d 782 (7th Cir.1997) (by 2–1 vote, denying last minute effort to stop execution). In this case Fleenor has had a full and fair opportunity to litigate these issues in the state courts, so the issue that divided the Burris panel in the last stages of the case is not presented.

**10.** An argument for mercy based solely on sweeping abstractions and appeals to religious beliefs may not amount to effective representation. See, *e.g., Hall v. Washington,* 106 F.3d 742, 749–50 (7th Cir.1997) (holding counsel was ineffective where counsel failed to contact defendant in preparing for sentencing hearing, failed to present mitigation witnesses, and failed in closing argument to offer "any reason other than blatant disregard of Illinois law for sparing Hall's life"). Fleenor's lawyers focused their argument as well on the specific mitigation evidence, the defendant, and the offense.

Fleenor himself who was responsible for all that evidence.

Fleenor showed in his post-conviction proceeding that it would have been possible for his trial lawyers to have found and presented more evidence than they did on several subjects relevant to mitigation. It is difficult to imagine a death penalty case in which the same could not be said to some significant degree. After a defendant has been convicted in a trial and sentenced to death, one would expect a further investment of professional time, money, and energy to turn up some additional evidence in mitigation and to try to show exactly where and why the defense effort was unsuccessful. The ability to turn up new evidence in mitigation (even evidence fully consistent with counsel's strategic choices) does not prove ineffectiveness. Before and during his trial, Fleenor was the beneficiary of more than 1000 hours of time from two skilled, experienced, and tenacious lawyers who fought to save his life. The argument that they were ineffective because their efforts were not successful and because others, without similar constraints of time, are able to find points to criticize runs directly contrary to the Supreme Court's warnings in *Strickland v. Washington.* See also *Kokoraleis v. Gilmore,* 131 F.3d at 696–97; *Waters v. Thomas,* 46 F.3d at 1514. Trial counsel's representation of Fleenor at trial, including the penalty phase of the trial, was well above the constitutional floor set in *Strickland v. Washington.* The court therefore need not address the prejudice prong of the *Strickland* analysis.

III. *THE TRIAL COURTS REFUSAL TO DISMISS CERTAIN PROSPECTIVE JURORS FOR CAUSE*

Fleenor next argues that the trial court violated his constitutional rights by refusing to excuse four jurors for cause after they indicated that they would automatically recommend the death penalty for anyone convicted of murder. A defendant in a capital case has a due process right to challenge for cause any prospective juror who maintains the view that the death penalty should be imposed in every capital case. *Morgan v. Illinois,* 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). *Cf. Witherspoon v. Illinois,* 391 U.S. 510, 522 n. 21, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (jurors may not be excluded for cause simply because they voice general objections to the death penalty or hesitancy about their ability to sentence a defendant to death, but they may be excused for cause if they make "unmistakably clear ... that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed") (emphasis in original); accord, *Wainwright v. Witt,* 469 U.S. 412, 424 n. 5, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

Fleenor used some of his peremptory challenges to remove the four prospective jurors in question. In *Ross v. Oklahoma,* 487 U.S. 81, 91, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), the trial court erroneously refused to excuse for cause a prospective juror who said he would vote to impose the death penalty automatically if the jury found the defendant guilty. The defendant then exercised one of his peremptory challenges to remove that juror. The Supreme Court held that the defendant's use of his peremptory challenge cured the trial court's error. 487 U.S. at 91, 108 S.Ct. 2273. The Court limited its holding, however, noting that there had been no claim that "the trial court repeatedly and deliberately misapplied the law in order to force petitioner to use his peremptory challenges to correct these errors." *Id.* at 91 n. 5, 108 S.Ct. 2273. Fleenor argues here that the trial court repeatedly and deliberately misapplied the law to force him to use his peremptory challenges.

The record does not support Fleenor's claim. During voir dire by defense counsel, prospective juror Knight said initially that she would vote to impose the death penalty if the defendant was found guilty.

**1050**

5 TR 2171. Defense counsel moved to strike Knight for cause, and the trial judge then asked Knight a series of questions to which Knight gave a fairly confusing series of answers. For example:

Q Okay now, now then again, what—what you're telling me is that no matter what evidence is presented at the second phase of the trial and mitigation on the part of the defendant, that you would ignore that evidence:

A Oh, no. I didn't mean that.

Q So, can you conceive of some situations in which you might not want to recommend the—the death penalty even though the defendant were found guilty of murder?

A No, I can't.

Q You can't. Can you keep your mind open to the extent that you would agree that it isn't always appropriate?

A Yes.

Q Okay. So, I have a little difficulty understanding exactly what you mean here, Mrs. Knight, and I want you to—I want you to understand what we're doing in this case so that you—that you can tell me what's really on your mind.

A Well, I don't know how to explain it, I guess.

Q Okay well, I—I had the feeling that maybe we just hadn't communicated this through very well. The, uh, in the second phase, if we get to a second phase in this case, the Defendant will be given an opportunity to present evidence to you, uh, in mitigation to show you that—that, uh, there are some factors that you should consider and would want you to conclude that you should not recommend the death penalty. Now see, if you have your mind made up at the beginning of that that no matter what he says or does—

A Oh, I didn't mean that.

Q Okay, and that—that's what it sounds like when you say that—

A That's what I said, I know what I mean, I just don't know how to explain it.

5 TR 2172–74. Knight went on to agree that she would be willing to listen to the defendant's evidence in mitigation and might decide not to recommend the death penalty even if she had voted to find him guilty. 5 TR 2175. Defense counsel then picked up the thread and Knight gave some more confusing answers, indicating in some that she would have to hear more evidence before she could decide whether to recommend the death penalty, and then saying that she thought that if it was proven that Fleenor was guilty of murder, then he should die. 5 TR 2176–77. Defense counsel renewed their challenge at that point, the trial court overruled it, and the defense exercised one of its peremptory challenges on Knight.

Prospective juror Jones told the judge several times during voir dire that he thought the death penalty should be applied in every murder case. 6 TR 2311–14. The questioning continued:

Q Can you conceive of a situation, during the death penalty phase, of hearing evidence that might lead you not to conclude that the death penalty was,—should be recommended?

A Well, if the evidence pro .. leads me to think that the death penalty .. (unintelligible).

Q I know this is a new area for you. And I don't mean to embarrass you; that's why come up here by yourself.

A Yeah. Well, if the evidence showed—leads me to where the death penalty ought not be there, then I would vote for not.

Q Okay, you'd vote for not recommending?

A Yeah, after the evidence would lead up to that point.

Q What kind of,—and I know it's ..
I'm asking you to anticipate things
that you couldn't have possibly have
thought of yesterday, but what kind
of circumstances do you think you'd
want to listen to make you decide
that you wouldn't want to recom-
mend the death penalty, do you have
any idea?

A Uh, not right off hand.

6 TR 2314. A few moments later, Jones
again said that if Fleenor were convicted
of murder, "I feel that the death penalty
should come to him, automatically," 6 TR
2317, but then said that he generally
thought the death penalty should apply in
murder cases, but that he would be willing
to listen to the evidence and be guided by
the court's instructions as to whether the
death penalty was appropriate, 6 TR 2318.
In response to the prosecutor's questions,
Jones said he was not automatically in-
clined to make a decision for or against the
death penalty. 6 TR 2325. Again, the
defense challenged for cause, the trial
court overruled the challenge, and the de-
fense exercised a peremptory challenge
against Jones.

Prospective juror Compton was asked
whether she felt that in every case where a
defendant is found guilty of murder that
the death penalty should be imposed. She
said, "Yes, I do." 7 TR 2525. The judge
then explained how the two phases of the
trial would work if the defendant was
found guilty, and Compton then agreed
that she would consider both sides and
agreed that the death penalty might apply
in some cases and not in others, and that
the death penalty should not be automatic.
7 TR 2526–27. The defense did not chal-
lenge Compton for cause but exercised a
peremptory challenge against her.

Prospective juror Pederson was ques-
tioned at considerable length by the judge
and counsel for both sides. He discussed
with them his personal views on several
subjects, including the presumption of in-
nocence and whether, when, and why the
death penalty should be imposed. He also
emphasized the difference between his
personal views and his willingness to listen
to the court's instructions and to follow the
law as instructed. See 8 TR 2943–3000.
When first asked, he said that the death
penalty should be imposed automatically in
every murder case where the defendant is
found guilty. 8 TR 2951. He later indi-
cated that he could follow instructions and
would not vote automatically for the death
penalty. 8 TR 2952–54. The defense
challenged Pederson for cause based on
his answers concerning his personal doubts
and difficulties with the presumption of
innocence. This was another instance in
which the prospective juror had given
somewhat contradictory answers, and the
trial court denied the challenge for cause.
The defense exercised one of its perempto-
ry challenges to strike Pederson.

█ The voir dire in this case does not
show "repeated and deliberate misapplica-
tion of the law" to force Fleenor to use his
peremptory challenges on prospective ju-
rors who should have been excused for
cause. The record shows instead a judge
who patiently explained some difficult and
unfamiliar concepts to jurors in ways that
first allowed the lawyers to hear the ju-
rors' instinctive reactions but also allowed
jurors the opportunity to learn more about
the role of the jury, to consider whether
they thought they could follow the court's
instructions, and to promise the court that
they could follow instructions. A good voir
dire includes some education of the pro-
spective juror about the trial to come, and
that educational dimension is especially ap-
propriate in a death penalty trial with its
unique procedures and issues. Also, it is
not unusual in voir dire to hear contradic-
tory answers. This can often occur when
a juror responds to a question the first
time with a candid and instinctive re-
sponse, before learning more about the
role of the jury and the court's instruc-
tions. Such candor can be very helpful in
the voir dire process. The United States
Constitution does not require, however,
that challenges for cause always be decid-

ed based on the juror's first and instinctive answer, often given without reflection about the role of the jury or the need to consider the evidence and the court's instructions.

In considering Fleenor's claim of "repeated and deliberate misapplication" of the law, it must also be noted that the judge took essentially the same approach with prospective jurors who answered that they would automatically vote *not* to impose the death penalty. He did not take their first answers at face value either. As he did with prospective jurors who said they would automatically vote to impose the death penalty, the judge asked follow-up questions to give the jurors an opportunity to indicate that despite their personal views, they would be willing to follow the law as instructed by the court. See *Fleenor I*, 514 N.E.2d at 84 (upholding exclusion of three jurors who repeatedly and unequivocally testified they could not consider imposing death penalty); 3 TR 623–26 (Yarnell); 4 TR 1008–15 (Adams); 8 TR 2900–01 (Smith).

The paper record cannot duplicate the many non-verbal ways in which prospective jurors communicate their views or attitudes to the trial judge and the parties. The judge on the spot must have some discretion in such situations to determine whether a challenge for cause is appropriate., especially where verbal answers are conflicting or equivocal. The record in this case does not show any error on this point, let alone a deliberate and repeated misapplication of the law to force Fleenor to use his peremptory challenges on jurors unalterably committed to supporting the death penalty in any murder case.

## IV. THE TRIAL COURTS ALLEGED PRE–DISPOSITION TO IMPOSE THE DEATH SENTENCE

On January 4, 1984, before the final sentencing hearing began, the trial judge met privately with all counsel. Attorney Todd testified in the post-conviction hearing that Judge McKinney told counsel words to the effect that, "Unless you give me some arguments to the contrary ... I intend to impose the death penalty." Todd testified that the judge "didn't say it as a statement, 'This is what I'm going to do regardless of what happens in this hearing.'" 6 PC 1497. Attorney Combs testified that the judge "announced to us that he had decided to impose the death penalty and that he had prepared a statement to that effect." 8 PC 1795. Combs also testified: "It was my impression that he had made his decision at that time." *Id.* After that brief conference, counsel presented no further evidence on sentencing, and the judge heard statements from Fleenor himself and arguments of counsel. After hearing their arguments, the judge sentenced Fleenor to death. Combs submitted an affidavit after sentencing stating in part:

4. The Judge of the Johnson Circuit Court read to the Defendant and his Court-appointed counsels his decision to impose the death penalty from a multi-page handwritten decision which had been prepared by the Judge prior to the sentencing hearing and the statements made by the Defendant and his Court-appointed attorneys.

2 TR 353.

Fleenor argues that this evidence shows that the trial judge violated his Eighth and Fourteenth Amendment rights because the judge failed to listen to the evidence of mitigation with an open mind. See, *e.g., Eddings v. Oklahoma*, 455 U.S. 104, 114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (sentencer may not refuse to consider mitigating evidence); *Hitchcock v. Dugger*, 481 U.S. 393, 399, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987) (same); *Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (sentencer must be able to consider and give effect to offered evidence in mitigation so that sentence reflects reasoned moral response to defendant's background, character, and crime). The post-conviction trial court made no specific findings on the precise contents of the confer-

ence before the final sentencing hearing, and the findings proposed by the State and Fleenor in that proceeding did not address the matter. The post-conviction court found that Fleenor's claim on this point was barred by the doctrine of *res judicata* and was without merit in any event. The Supreme Court of Indiana agreed on both grounds. See *Fleenor II*, 622 N.E.2d at 151–52. That court concluded on the merits that the evidence did not show that the judge had reached his "final decision before hearing all evidence and arguments of counsel," *Fleenor II*, 622 N.E.2d at 152, and commented that accepting Fleenor's argument "would condemn trial judges for being prepared." *Fleenor I*, 514 N.E.2d at 88.

This court agrees. The evidence shows that the trial judge did what one would hope any judge would do before imposing a death sentence: consider the evidence and arguments and think carefully about the decision before walking into the final hearing at which the decision will be announced. There is nothing wrong, let alone unconstitutional, with the judge informing counsel for all sides of his current thinking before they have a final opportunity to address the court. For example, an appellate (or trial) judge may sometimes express tentative views on a case during oral argument in order to give counsel a fair opportunity to address the judge's concerns during the argument. Such indications of the judge's thinking can often be helpful for counsel by focusing their attention on the judge's principal concerns. In this case the judge let counsel know that he thought the evidence warranted the death penalty before he heard final argument. That does not show he had made up his mind unalterably before he heard the argument and announced his final decision. The facts that he had considered his decision before the final hearing, had organized his thoughts in writing, and had informed counsel of his thinking before the hearing do not show a violation of Fleenor's constitutional rights.

## V. ASSERTED PROSECUTORIAL MISCONDUCT IN ARGUMENTS TO THE JURY

Fleenor argues that several portions of the prosecutors' closing arguments at the guilt-innocence phase and sentencing phase of the trial violated his due process right to a fundamentally fair trial. In considering such claims in habeas corpus cases, the federal courts do not exercise "supervisory" powers over the state courts or prosecutors. The federal courts act only as a kind of constitutional backstop to ensure that trial errors do not so infect the trial as to render it fundamentally unfair. It is not enough that the prosecutor's remarks were "undesirable or even universally condemned"; the "relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction [or sentence] a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), and *Darden v. Wainwright*, 699 F.2d 1031, 1036 (11th Cir.1983) (vacated panel opinion in *Darden*). The court will apply this standard first to the challenged points in the closing arguments at the guilt-innocence phase of the trial and then to the closing arguments in the penalty phase.

### A. Arguments in the Guilt–Innocence Phase

Fleenor has challenged two portions of the prosecutor's closing argument at the guilt-innocence phase of the trial. First, the court had appointed psychiatrist Gordon Brown to examine Fleenor. Dr. Brown testified at trial to the effect that Fleenor did not have any mental condition that amounted to legal insanity. He also stated his opinion that if "given the opportunity, [Fleenor] will continue to involve himself in similar behavior in the future." 14 TR 4488. In the rebuttal segment of

the prosecutor's closing argument, the prosecutor made the following statement:

> We don't have someone who's fragmented—who's lost touch with reality. His ego and his personality was not ruptured. That's the testimony of Dr. Brown. He also said he was unlikely to improve. He will continue to involve himself in similar conduct, in the future, given the opportunity.

15 TR 4655. Fleenor's counsel had not objected to Dr. Brown's testimony on this point. Assuming for purposes of argument that this evidence was objectionable at the guilt-innocence phase, it is difficult to see how a prosecutor engages in "misconduct" by reminding the jury accurately about evidence that was admitted without objection. To the extent that the phrasing of the comment might be interpreted as indicating the prosecutor's personal beliefs, this jury was warned, as virtually all are, that counsel's arguments are not evidence, and juries tend to take them with a substantial grain of salt. This comment did not infect the trial so as to render it fundamentally unfair.

Fleenor next challenges the prosecutor's references to a statement that Sandra Sedam attributed to Judge Hoying of the Jefferson Superior Court. (This was the same Judge Hoying that Fleenor was talking about killing in the bar the night before he murdered the Harlows.) During cross-examination of Sandra Sedam, the defense brought out the facts that in the autumn of 1982, after she had complained of abuse and Fleenor had been arrested, she had gone to Judge Hoying to see if Fleenor could be given some form of treatment for alcohol abuse, and that Judge Hoying "said that he couldn't help D.H.; that he wouldn't help D.H." 12 TR 3825. On redirect, the prosecutor asked Sandra if she knew whether Fleenor had gone to the judge himself to ask for help. She said no. The prosecutor then asked what Judge Hoying had said to her:

> A He told me that sending D.H. up to the State Hospital would be a waste of the taxpayer's money, because he didn't think that it would help D.H. and uh D.—he didn't know what to do with D.H.; D.H. was just mean.
>
> Q Did he say that—to wait until D.H. wanted to change? Or did he just say D.H. is just mean?
>
> A He said ju—D.H. was just mean.

12 TR 3873. There was no objection from the defense to this testimony. The prosecutor then made use of this testimony in his closing argument:

> This man is not mentally ill and that's not why this happened. This happened because of something that was said in Sandy's testimony. She testified that she went to Judge [Hoying], the Judge in Jefferson County, and asked the Judge to submit the defendant to alcohol treatment and the Judge said, No, I'm not gonna send him to alcohol treatment. Now, on cross-examination, by Will: Sandy, what did the Judge tell you? Why was he not gonna do this? Uh, well, Ladies and Gentlemen of the Jury, the Judge wasn't gonna do this because he said: It was a waste of the taxpayer's money to submit this man to an alcohol abuse program, because he's just mean. He has an antisocial personality; he's just mean. The man who said that—the Judge of the County in which this man lives. This man who was arrested 40 odd times and sentenced to numerous ... jail sentences. That Judge said, No, it's a waste of the taxpayers money because he was just mean. There are some people who are crazy and there are some people who are mean. And this happened. The why of this is because he was just mean.

15 TR 4563–64. These comments were the finale of the initial portion of the prosecution's final argument.

The statements attributed to Judge Hoying were inadmissible both as hearsay and as opinion testimony. But there was no objection to the testimony elicited by the prosecutor on redirect, and again, it is

difficult to accuse a prosecutor of "misconduct" for reminding the jury accurately about evidence that was admitted without objection.

Fleenor tries to counter the lack of objection by arguing that it is "clear from the context of this testimony" that Judge Hoying's opinion of Fleenor was not offered for its truth but for the non-hearsay purpose of showing why the request for treatment had been denied. Fleenor Mem. at 52. He argues that the prosecutor "deliberately ignored this limitation" on the evidence in using it as he did in the closing argument. *Id.* The record does not support this argument. The testimony about the statements attributed to Judge Hoying was not the subject of an objection or a request for a limiting instruction. Fleenor's suggestion now that the testimony could have been offered for a limited non-hearsay purpose to show why the request for treatment was denied is not persuasive. There is no indication in the record that the testimony was offered for a limited purpose. Even if such a limited purpose had been suggested, the limited purpose that Fleenor now proposes would have been irrelevant—just as irrelevant as the testimony that the defense originally elicited—that Sandra had asked Judge Hoying to order treatment and Judge Hoying had said no.

No trial is perfect, and the Constitution does not require perfection, even in capital cases. This sequence of testimony and its use during closing argument provide an example of a type of imperfection that can arise in many trials. First, one side offers inadmissible evidence—here, the irrelevant and hearsay evidence that Judge Hoying had rejected Sandra Sedam's request for alcohol treatment for Fleenor. The opposing side does not object (whether as a result of deliberate choice or oversight) and then tries instead to turn the point to its own advantage (or at least to blunt the evidence) by bringing out an additional fact. At that point, it can be difficult for the side that created the problem to ob-

ject. Finally, neither side asks the trial court to intervene at any point in the exchange. This is not the stuff of a constitutional violation, and the prosecutor's use of this hearsay testimony in the closing argument did not deprive Fleenor of a fundamentally fair trial. The evidence of Fleenor's guilt was overwhelming. The court-appointed psychiatrists provided no support for a "guilty but mentally ill" verdict, let alone an insanity defense. Even the psychologist called by the defense offered only limited support for a "mentally ill" verdict. Fleenor has not shown that the prosecution's arguments in the guilt-innocence phase denied him a fair trial.

### B. *Closing Arguments in the Penalty Phase*

Fleenor challenges a larger number of statements made in the closing argument at the penalty phase. First, Fleenor argues that the prosecutor misstated the law to the jury in the argument with respect to the mitigating factor that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired by mental disease or defect or intoxication. The prosecutor quoted the statutory language and then said:

Now let's just take the first part, about mental disease and defect. What I've just read to you is the definition of insanity and you, a Jury, have found that insanity is not present in this case. There have been 3 doctors who have testified and none of those doctors—3 medical doctors and a psychologist—a Doctor of Psychology. And none of those people have indicated that the defendant was insane when he committed this crime. So, that, simply, is not present, in this case. And you've already made that determination; you've already found that. Then, was the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law

subs—substantially impaired as a result of intoxication? Yesterday, we heard a lot of evidence about that. . . .

16 TR 4960–61. The prosecutor misstated the law on this point. The standard for the insanity defense at the time was whether the defendant substantially *lacked* the mental capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. See Ind.Code § 35–41–3–6; 15 TR 4671–72 (trial court's final instructions). For a verdict of "guilty but mentally ill," which was the best the defense could reasonably have hoped for, the law defined "mentally ill" as "having a psychiatric disorder which substantially disturbs a person's thinking, feeling, or behavior and impairs the person's ability to function; 'mentally ill' also includes having any mental retardation." Ind.Code § 35–36–1–1; 15 TR 4672 (trial court's final instructions). The statutory mitigating factor for the death penalty is phrased in terms of substantial *impairment* of the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to law.

The State defends the prosecutor's statement in the argument by suggesting that the prosecutor was merely urging "the jury, which had already rejected Fleenor's insanity defense, to do so again for sentencing purposes." Resp.Mem. at 33. That is not correct. There is a clear difference between the standards for a verdict of not responsible by reason of insanity and the mitigating factor for the death penalty. But the jury had also rejected the defendant's argument and evidence in favor of a verdict of guilty but mentally ill. The definition of mentally ill is not exactly the same as the standard for the mitigating factor, but they both speak in terms of substantial impairment. The definition of

"mentally ill" is, if anything, broader than the corresponding mitigating factor. If the prosecutor had framed his argument in terms of the jury having already rejected the mitigating factor by rejecting the verdict of "guilty but mentally ill," there would be less room to argue that he misstated the law.

In view of the jury's rejection of the verdict of guilty but mentally ill and the trial court's correct (and unchallenged) instructions as to the mitigating factor, the instruction to the jury to follow the law as stated in instructions rather than as argued by counsel, as well as the lack of any objection to the prosecutor's misstatement of the law, this court cannot say that the misstatement so infected the sentencing proceeding as to deny Fleenor due process of law.[11]

Second, Fleenor argues that the prosecutor asserted his personal opinions as to the credibility of the court-appointed psychiatrists and of Father Duff Green. In arguing against the testimony of Dr. Keller, the prosecutor argued that he lacked sufficient professional background to provide a credible opinion about the physical effects of alcohol on Fleenor. He then referred to the testimony of Dr. Brown and Dr. Fitzgerald:

We had 2 people who are psychiatrists who testified in this case—people who have been to medical school; people who have taken far more chemistry than 101; people who have taken far more biology than 101. They, quite frankly, they testified in a most convincing fashion; they were very familiar with their field; they knew exactly what they were talking about and they were very impressive people and I thought their opinions were well-reasoned. Now, it is amazing, folks, it's absolutely amazing that we

---

11. In the state post-conviction proceeding, attorney Todd testified that, as a matter of trial strategy, he was generally reluctant to object during opposing counsel's closing arguments. See PC 1455–56; PC 1504–10. Neither side objected during the other's closing arguments at either phase of Fleenor's trial. Fleenor has not argued that the lack of objections amounted to ineffective assistance of counsel; the court also sees no basis for such a claim. The decision not to object appears to have been a reasonable exercise of counsel's professional judgment.

have 2 very qualified people who have testified before you—psychiatrists, nonetheless, and they were never asked a question about T.H.I.Q. [a chemical that was the subject of Dr. Keller's testimony about alcoholism].

16 TR 4982–83. There was no objection to this argument. Although the phrasing of the point in terms of the prosecutor's own opinions was not appropriate, there is no reason to think it was so prejudicial as to deprive Fleenor of a fundamentally fair sentencing proceeding.

In the rebuttal argument at the penalty phase, the prosecutor reviewed evidence tending to show that Fleenor was in control of his faculties and behavior before, while, and after he murdered the Harlows. The prosecutor then said:

> This is not a killing of passion; it is not a killing of love; _____. It is a killing for control. As I told you in my opening statement, it is a killing for control at 1510 Washington Street and he was going to rule that house and he was gonna rule those people that were in it. The defendant does not love people; he uses people. He uses Deb—he used Debra Slaughter; he used Sandy; he's used his attorneys; he had used the priest; he uses people. I didn't think [Father] Duff Green was bluffed; I didn't think that, at all. I thought he was a man who had been given the wrong information. [Pause] This is not the Indiana Legislature. It's not your job to change this law, yet most of the argument of defense counsel was to that effect.

17 TR 5076–77. The defense had been permitted to have Father Green explain why he did not think Fleenor should be sentenced to death. The first point he made was the kind of "warmth and humanity" Fleenor had shown by "his concern and interest in Justin, who is not his own child, but, yet, he loves and wants to care for." 15 TR 4741. On cross-examination, the prosecutor asked Father Green whether defense counsel had told him that on the evening of December 12, 1982, Fleenor threatened to kill Justin. Father Green had not been aware of that undisputed fact. 16 TR 4757. The prosecutor's comments about Father Green's testimony in the rebuttal argument did not infect the trial so as to render it fundamentally unfair.

Third, Fleenor argues that the prosecutor made improper references to Fleenor's past criminal history even though Fleenor had not invoked a lack of prior criminal conduct as a mitigating factor. After arguing that three statutory aggravating factors were proven beyond a reasonable doubt, the prosecutor went through the statutory list of mitigating factors, including the first one, which is that the defendant has no significant criminal history. The prosecutor summarized in about 20 lines of transcript a lengthy criminal record that included violence. 16 TR 4959. The prosecutor was describing evidence that Fleenor himself had presented, much of it his own testimony. The prosecutor did so without objection. It was not improper for the prosecutor to analyze each of the statutory mitigating factors, including this one, and it did not violate Fleenor's due process rights.

Fourth, Fleenor argues that the prosecutor improperly informed the jury of his own emotional feelings about the case and his decision to seek the death penalty. The prosecutor began his argument at the penalty phase as follows:

> On uh December 15th, 1982, in the early morning hours, I began this case. Well, not really morning—late evening hours; early morning hours of the 16th, I began this case. And this is my last act in this case. It uh—it's been a hard year and uh I've tried to bring together, on behalf of the State of Indiana, all the evidence that I know to put before you and uh I would like to say that the police officers in this case have done an outstanding job. And uh they have done their job and I hope that I've done mine. And, pretty soon, it's going to be your task, in this case. What we are dealing with

here, today, is: Do we have the right to protect ourselves? This is not an ordinary crime. It wasn't an ordinary crime on December 15, in the early morning hours—or, the 16th, in the early morning hours and late—late evening hours of the 15th. And it's never been an ordinary crime. It's an extreme in human behavior. The State of Indiana—the Prosecutor's office—in certain circumstances, can allege the aggravating circumstances of a murder and seek death penalty. And that is what—that I—that's what I did, in this case. And I assure you that was not easily arrived at. These are serious decisions and you all know that. And in evaluating a case and looking at evidence, you know, we cannot just simply shut out our emotions, you know, and how we feel. Our feelings about something. 'Cause how we feel about something is spontaneous. I mean, I cannot want to feel a way, and I still feel it. It just happens to us. You can see a picture; you can hear something said; you can look at something; and, you have emotions and feelings inside of you. And, it's a difficult task to set aside what our feelings are and what our emotions are about an act like this, you know, and make our decision based on what the law of this State is and what the evidence is. And that's what our job is. That's what my job was when I was evaluating this case and that's what your job is. But this case is not to be decided out of an outrage toward the defendant. The State of Indiana is not asking you to decide this case because you're outraged at the defendant. And it's not to be decided out of sympathy for the defendant. Some of the testimony yesterday was difficult, in the late evening hours of yesterday. It's hard to watch a mother on the stand talking about her son's life. But this case is not to be decided on sympathy for the defendant. The Court will instruct you on that, and during the final argument in the trial phase of this case—well, Mr. Combs and [prosecutor Will Goering] talked about emotions and stirring your emotions and I would just suggest to you, that it's going to be very difficult to talk about this case and argue this case and not hit on things that are going to stir your emotions. The question is whether that is a—an uh deliberate attempt to manipulate you or not, I guess, this may be a question for you in evaluating the credibility of our arguments, but what I'm—what I'm really suggesting is: It's gonna be impossible for us to stand up here and make argument to you about this kind of an event and not arouse in you some emotions, whether they be absolute outrage at what the defendant did or the heart tug of a mother begging for her son's life.

16 TR 4952–55. This portion of the prosecutor's argument certainly had more of a personal flavor than is appropriate. But there was no objection to the argument, and the prosecutor was, in this court's view, only acknowledging an indisputable fact in telling the jury that the case evoked powerful emotions. There is little point in denying that fact at any stage of the legal process. The challenge for jurors and judges is to transcend those emotional reactions and to weigh the case calmly and according to the law, and that is exactly what the prosecutor was telling the jurors to do. There may be room to argue that this type of argument was subtly trying to reinforce the jurors' emotions by describing those emotions and then telling them to disregard their emotions. Nevertheless, in light the evidence and record as a whole and the absence of any objection, this portion of the argument did not undermine the fundamental fairness of the sentencing decision.

Fifth, Fleenor argues that the prosecutor's uses of the words "enemy" and "animal" in closing penalty arguments were improper. Near the end of the prosecutor's initial argument at the penalty phase, the prosecutor was reviewing evidence that reinforced the State's view of the

murders as calm, cold-blooded murders planned by a dangerous, calculating man. He described Fleenor's murder of the wounded Bill Harlow by shooting him in the back of the head, then said:

It was not an act of self-defense; it was not an act of an insane person; it was not an act of a person who had made a mistake; it was not an act of a person acting out of fear; not an act of a coward. He was and is, quite simply, folks, the enemy. What is the enemy? There are those people that will deny us our freedom. It could be a foreign foe or it could be a criminal. He is the enemy who asks for his own life, in this matter, and juxtaposed to that is society that says: When will it end? When is enough too much? Can we not protect ourselves? How do you know, Mr. Alcorn, that he is the enemy? In common-sense. You saw those letters; you watched his demeanor of the stand [sic]; and the doctors told you he was an antisocial personality; he was against us. The law sets out aggravating circumstances in murder cases in which people can receive the death penalty, if the aggravating circumstances outweigh the mitigating circumstances. Why does the law do that? Why does the law say, in some cases, if certain circumstances apply, the death penalty. Because those circumstances are to find you, folks, who the enemy is. The enemy is people who kill innocent people in our society, while laying in wait; people who break into homes and kill people; and people who kill and kill again. Those are the people who are enemies and that's what the statute is there for and that's what it's saying.

\* \* \* \* \* \*

We have a right to protect ourselves against these kind of people who think this way. We do, folks, we have that right. And we have a right to protect ourselves; the prison guards that have to deal with this man; we have a right to protect the jail dispatchers; we have

a right to protect the people in this room. The society that cannot see this is the enemy has become the coward and the weak-kneed; the society says that this act is like the other acts and is punishable like the other acts, has lost its ability to stand up against the blackness and against the enemy.

16 TR 4989–90, 4991–92. There were no objections to these portions of the closing argument, but it deserves condemnation. The repeated use of the term "enemy" in this passage of the argument reads like an effort to evoke the emotions of mob violence and vigilantism. Nevertheless, as the Supreme Court said in *Darden v. Wainwright*, it is not enough that the prosecutor's remarks were "undesirable or even universally condemned." The issue is whether the comments "so infected the trial with unfairness as to make the resulting conviction [or sentence] a denial of due process." 477 U.S. at 181, 106 S.Ct. 2464.

Reading the transcripts of the closing arguments in this case brings to life, in a way that transcripts often do not, a trial in which emotions were running high on both sides. The evidence of the two murders, committed in front of the victims' grandchildren and daughter, should have shocked anyone who had the capacity to be shocked. The question of punishment forced counsel, the jurors, and the judge to confront profound questions of morality and justice. The trial judge gave the defense substantial latitude in presenting evidence concerning the asserted absence of justification for the death penalty in terms of morality, efficacy, and even theology. Counsel on both sides did not shy away from those questions, or from their difficulty or importance, in the closing arguments. In view of the evidence and arguments presented by the defense, the prosecutor's arguments as a whole, and the trial judge's instructions and other efforts to ensure that jurors stayed focused on the law and the facts, this court concludes that the objectionable but unobjected to references to the "enemy" were not

so prejudicial as to render the sentencing proceeding fundamentally unfair.

The use of the term "animal" occurred in a portion of the prosecutor's rebuttal argument that was in direct response to an argument by defense counsel using the same term. In their closing argument, the defense counsel tried hard to show the human side of Fleenor, to present him as a victim of a harsh childhood and meager abilities to succeed in society, to present his crimes as products of mental illness and/or alcohol addiction, and to urge the jurors to stop the killing. At one point, the defense pleaded with each juror who might oppose a death sentence to have the courage to stand by his or her convictions and insist against a recommendation of death. 17 TR 5009. Defense counsel then suggested a series of arguments that could be made in deliberations:

> During your deliberations, surely, there's going to be one among you who has the courage to argue for life on behalf of D. Fleenor. Surely, one of you will stand before your fellow Jurors and argue for D. to—to say why we should not kill him. You can start with the argument that he's a human being and uh make the best argument you can for him. Be very sure that you haven't o— overlooked anything mitigating, on his behalf. You can talk about his childhood; you can talk about his addictions to alcohol and drugs. You can talk about his family. Sometimes, it can be just a very small act that you heard of— a touch of kindness, like buying the uh the wooden rocking horse for Justin last year that brings out, for you, that D. Fleenor is, when everything is said and done, a human being who shouldn't be recommended to death. As you sit here, you know, I wonder—are you able to see D. Fleenor, as a human being? I know he's not particularly pleasing to look at—and he's sort of embarrassing to look at, but can you see him as a human being? And not as criminal; not as an animal. You say, I—those—I love those

labels. We put labels on people—defendants—and those labels permit us to rationalize killing them. We don't kill a human being; we kill a defendant or an animal. We need a label to commit it.

17 TR 5010–11. In the prosecutor's rebuttal argument, he said:

> And, thirdly: Sometimes the small things are important. The wooden rocking chair. His gift to a child. Is that really a mitigating circumstance in this case? Mr. Fleenor's kindness to children? You know the evidence in this case. I submit to you that a gift of a rocking horse does not prove that Mr. Fleenor has kindness to children. Able to see the defendant as a human being, and not label him as a defendant or an animal. Well, Ladies and Gentlemen, all the words that we use are labels. Every word is. Human being is a label. So is strike. Words are simply verbal noises or sounds that we use in communicating. What really happened. And we use the word defendant, because under our criminal justice system he is, in fact, a defendant. He's a person accused of crimes. That's not a misused label. If somebody used the word animal in this case, I submit to you the events at 1510 Washington Street on 12–12–'82 were the acts of an animal. And that's not a misuse of the label.

17 TR 5069–70. There was no objection to this portion of the argument. This response by the prosecutor to the defendant's suggestion that we use the labels "defendant" or "animal" to justify executing a human being was not so unfair as to poison the sentence imposed here.

Sixth, Fleenor argues: "Without supporting evidence, the prosecutor invoked uncharged misconduct to paint Fleenor as a potential mass murderer." Fleenor Mem. at 55. The reference is to the following passage in the closing argument:

> If it was not the Harlows, there were others: Judge [Hoying], the police officer, Rick Sanders, the 5 of them, Angie, Billy, Sandy, Bill and Jean Harlow, Jus-

tin, Jim Sedam and his family, the police officers in Tennessee, Tammy, Vicky and her children, the dispatcher at the Jefferson County Jail and any other officer who happened to be in the way and the President of the United States, if he had to. Sixteen individuals or groups and, in the past, he had killed—had attempted to kill people.

16 TR 4987. The jury had heard or read evidence showing that Fleenor had threatened all of those individuals or groups of persons either in the events leading up to the murders, in trying to flee with hostages and resulting in his arrest, or in the course of his efforts to persuade Debra Slaughter to help him escape from jail at gunpoint. In the context of that evidence, the prosecutor's references were to Fleenor's threats and his stated willingness to kill all of those people. The prosecutor did not act improperly by reminding the jury of that evidence at the penalty phase.

Seventh, Fleenor argues that the prosecutor "charged Fleenor with acts of torture upon Angela and Billy Harlow without any evidence of physical torture." Fleenor Mem. at 56; see 17 TR 5079–81. The prosecutor did not suggest that Fleenor physically tortured Angela and Billy Harlow, nor would the jury have understood the comment that way. The defense had presented evidence and arguments about Fleenor's kindness toward nieces and nephews. In direct response, the prosecutor reminded the jury how Fleenor had treated the children when he murdered their grandparents. He ordered Billy Harlow to come out from behind the couch so he could see the murder of his grandmother. He ordered Billy and Angela to help drag their murdered grandmother's body to another room. Billy testified that he was afraid Fleenor would kill him. Fleenor held a gun to Angela's head as she talked with her mother on the phone, and he threatened to kill her and everyone else if she did not follow his orders in talking with James Sedam. See 17 TR 5079–81. The prosecutor then said:

And if Angie messes up, everybody in the car and everybody in Jim's house are dead. What did Angie Harlow de— deserve? What did she do to deserve this? What was it that she had done? She had merely been present when he decided to control that place. He didn't just kill people that night; he tortured people.

17 TR 5081. Each of those specific points was supported by evidence. Each of those points was unrebutted by evidence. The prosecutor's characterization of the experience for Billy and Angela Harlow as "torture" was not unfair, especially in response to defense arguments about Fleenor's love and attention for children. In summary, the prosecutor's closing arguments at the sentencing phase of the trial did not deprive Fleenor of a fundamentally fair sentencing proceeding.

VI. *INFORMATION ABOUT THE POSSIBILITY OF FLEENOR'S RELEASE FROM PRISON IF NOT SENTENCED TO DEATH*

 Fleenor also argues that his Eighth Amendment rights were violated when the trial judge instructed the jury about the alternatives to the death penalty and when the prosecutor pointed out in his arguments the possibility of release from prison after 15 or 20 years if Fleenor were not sentenced to death. The trial court decided before the final arguments in the penalty phase to give the jury an instruction informing them about the other alternatives. Then, during the prosecution's closing argument at the penalty phase, the prosecutor told the jury that Fleenor could not be sentenced to life in prison:

You know, if it's an ordinary crime, he's sent to prison and he mixes with the general population of the other people who are in prison. There's no life imprisonment in this state. There's a term of years. The statute does not say that we want to keep people for life, who do things like this. Because we don't want people like this—this type of mentality

can mix with the other people who are gonna be let out in our—into our society. There's no life imprisonment for people who commit these kind of aggravating circumstances, because we don't want that mentality mixed.

16 TR 4991. Fleenor's counsel did not object to this point during the prosecutor's closing argument. During the defense closing argument, attorney Combs explained the terms available:

> You couldn't vote for a lenient sentence in this case if you wanted to. The law prevents it. It goes like this: Murder, in the State of Indiana, carries the standard—the presumptive term of 40 years. That's where we start—40 and 40. Admittedly, 10 years can be subtracted. Also, 20 years can be added. Burglary, a Class B felony, a standard term; presumptive term, 10 years, no reduction. But 10 years can be added. The maximum sentence that D.H. Fleenor is facing in this courtroom is 140 years. The standard sentence that he's facing is 70 years. I suppose, over here, this could—this would be a 60, if it—if 30 years were imposed on each of the homicides. Realistically, folks, we're talking between 70 and 140 years. Now, you have heard uh uh testimony—evidence about the uh good time system in Indiana, which means you get a day credit for each day served. This means—we're talking about 35 years here and we're talking about 70 years, here. Now, the only other thing I would say, the law provides for concurrent and consecutive sentences. Consecutive sentence means you do 60; you do 60; you do 20. concurrent sentence means they can be doubled up. You do 20; you do 60 and then you do 20. I don't think that's realistic. That's not realistic. I—I submit to you that we're talking about uh sentencing alternative between 70 and 140 years, which, in effect, would be 35 to 70 years. D. Fleenor was 31 years

old when this happened. And you see why I say I—I believe he's gonna die in prison? If the death penalty is not imposed—is not imposed—if it's not recommended and it's not imposed, the Court determines the sentence. I would ask you people to trust the Judge. Each of this is incredibly severe sentence. Seventy years or 140 years and, of course, death. Incredibly severe.

17 TR 5015–16. In the final moments of attorney Todd's closing argument for the defense, he underscored the point:

> He's gonna be here the rest of his life. Is that not punishment? We don't have to kill him. My God, remember, you're not votin' to let him off. He's not going to know the joys of being with a family. The Judge can sentence him to up to a 140 years in prison. If you think he should spend the rest of his life in prison, again, write it down and tell [the judge] that, but don't kill him. Don't kill him.

17 TR 5059–60.

In his rebuttal argument in the penalty phase, the prosecutor responded to these arguments:

> And I'm sure we all know that this is supposed to be 90, at this point; 40 – 40 and 10 – 90.[12] And so this is 45 years, with good time that he would serve if he received 40 years on Count I; 40 years on Count II; 10 years on Count III. That is called consecutive sentencing, in the State of Indiana. In other words, each crime is sentenced, consecutively, after that. There are 2 kinds of sentencing in this state: One is consecutive and one is concurrent. The concurrent sentencing is when all of the sentences run at the same time. In other words, he's serving the sentence on Count I, the sentence on Count II and the sentence on Count III, at the same time. So, if we do that—if we have concurrent sentencing, in this case, and we give him

---

**12.** At this point the prosecutor was apparently referring to figures written on a blackboard and displayed to the jury during the defense argument.

the presumptive sentence, we give him 40 years. And if we give him good time, we give him 20 years. Twenty years in, folks. That's possible; I don't think it's realistic, but it's possible. He could get 20 years.

17 TR 5070. The trial court included in its final instructions information about the available sentences:

The alternative sentences available are: (1) On each count of murder, defendant could be sentenced to death. Or, (2) The defendant could be imprisoned for a fixed term of 40 years with not more than 20 years added for aggravating circumstances or not more than 10 years subtracted for mitigating circumstances. Further, the defendant could be imprisoned for a fixed term of 10 years for burglary with 10 years added for aggravating circumstances or 4 years subtracted for mitigating circumstances. The Court can impose these sentences concurrently or consecutively. In addition, the defendant may be fined not more than $10,000.00. If the defendant is sentenced to a term of imprisonment by this Court, he may receive credit time, which, at the earliest, could allow him to be released on parole, after serving one-half of the term of imprisonment imposed by this Court.

17 TR 5090–91.

This information was inaccurate at the time of Fleenor's trial.[13] Fleenor argues, however, that the information about sentencing alternatives violated his Eighth Amendment rights by inviting the jury to recommend death based on concern that the trial court might not impose a heavy enough sentence to keep him in prison for the rest of his life. The Supreme Court of Indiana rejected Fleenor's argument:

At the penalty phase of a capital case, where there is reason to believe that the jury will engage in speculation over the

extent of alternative penalties, it is within the discretion of the trial judge to make the jury aware of them. *Burris v. State* (1984), Ind., 465 N.E.2d 171. The policy underlying the exception is that when jury speculation is inevitable because of some particular event, it is better to entrust the jury with complete and accurate information. The information supplied by the challenged instruction and the trial prosecutor's final summation was accurate.

*Fleenor II*, 622 N.E.2d at 145.

The State argues that accurate information about sentencing alternatives is permissible under *California v. Ramos*, 463 U.S. 992, 1009, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). In *Ramos* the Supreme Court upheld an instruction prescribed by statute advising a sentencing jury that the state's governor could modify a sentence of life imprisonment without parole to a lesser sentence that could include the possibility of parole. 463 U.S. at 1003, 1005–06, 103 S.Ct. 3446. Fleenor seeks to distinguish *Ramos* on the ground that Indiana law did not permit consideration of a defendant's future dangerousness in the sentencing decision. More recently, however, the Supreme Court has made it clear that the federal Constitution does not prohibit the trial court or the prosecution from presenting truthful information about sentencing alternatives, and that in some instances the Constitution may require that such information be provided upon the demand of the defendant. In *Simmons v. South Carolina*, the Court explained:

In a State in which parole is available, how the jury's knowledge of parole availability will affect the decision whether or not to impose the death penalty is speculative, and *we shall not lightly second-guess a decision whether or not to inform a jury of information regarding parole*. States reasonably

---

13. Indiana has amended its law to provide for a sentence of life without possibility of parole if the jury finds that capital aggravating circumstances have been proven beyond a rea-

sonable doubt and outweigh any mitigating factors. See Ind.Code §§ 35–50–2–9(e) and 35–50–2–3(b), as amended by Pub.L. 250–1993.

may conclude that truthful information regarding the availability of commutation, pardon, and the like, should be kept from the jury in order to provide "greater protection in [the States'] criminal justice system than the Federal Constitution requires." [*California v. Ramos*], 463 U.S. at 1014, 103 S.Ct. at 3460. *Concomitantly, nothing in the Constitution prohibits the prosecution from arguing any truthful information relating to parole or other forms of early release.* 512 U.S. 154, 168–69, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (emphasis added). Accordingly, neither the instruction nor the prosecution's accurate remarks about sentencing alternatives violated Fleenor's constitutional rights.

In any event, the jury could not have reasonably expected that Fleenor would be sentenced to anything that would not, as a practical matter, amount to a life sentence. They had just found Fleenor guilty of murdering two helpless family members after breaking into their house and lying in wait for them. The jury and the trial judge who would make the final decision knew that he had committed these crimes in front of children and his wife, whom he then forced at gunpoint to conceal the crime and to flee with him to Tennessee. They also had heard that Fleenor had tried to arrange for an escape from the jail where he was being held. As Fleenor's lawyers told the jury, any realistic sentence in the case would have directed that Fleenor die in prison, and the jury would have understood that fact. The information about alternatives to the death penalty did not violate Fleenor's Eighth Amendment rights.[14]

### VII. *JURY INSTRUCTIONS AT BOTH PHASES OF THE TRIAL*

■ The record shows that the trial court gave an erroneous instruction on vol-untary manslaughter. The instruction reads as follows in the trial transcript:

A person who knowingly or intentionally kills another human being while acting under sudden heat commits voluntary manslaughter, a Class B felony. The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder to voluntary manslaughter. To convict the defendant, the State must have proved each of the following elements; that the defendant knowingly or intentionally killed another human being. If the State failed to prove each of these elements beyond reasonable doubt, you should find the defendant not guilty. If the *defendant* [sic] did prove each of these elements beyond a reasonable doubt, and you further find that the defendant did the killing while acting under sudden heat, you should find the defendant guilty of voluntary manslaughter, a Class B felony. The crime of voluntary manslaughter is distinguished from the charged crime of murder by the inclusion, in voluntary manslaughter, *of the element* of a sudden heat.

15 TR 4669, as quoted in *Fleenor II*, 622 N.E.2d at 146 (emphasis supplied by Supreme Court of Indiana). The Supreme Court of Indiana held that this instruction was erroneous because at one point it misstated the burden of proof and at another point treated sudden heat as an element of the crime rather than as something the State was required to disprove beyond a reasonable doubt. *Id.* at 146. The Indiana court held that the error in the instruction was harmless beyond a reasonable doubt for two reasons. First, the court concluded that a reasonable juror would have immediately recognized the misstatement on the burden of proof as "an inadvertent and patent error and con-

14. Also, to the extent the jury might have been concerned about the possibility that Fleenor might not die in prison for any other reason, that possibility was based on Fleenor's attempt to escape from the Madison County Jail after he learned that the death penalty might apply to him.

sequently discounted its express message." *Id.* Second, the court found no evidentiary predicate in the record to support giving any voluntary manslaughter instruction. *Id.*

The voluntary manslaughter instruction was not included in the written set of final instructions contained in the record at 1 TR 249–50 and 2 TR 251–80. The fact that the instruction as recorded in the trial transcript so clearly misstated the burden of proof, together with the fact that none of the able lawyers in the courtroom objected, leads this court, frankly, to have doubts about the accuracy of the transcript at that point. Assuming that the transcript is accurate, however, as this court is doing for all other issues in this case, this court agrees with the second ground cited by the Indiana court for finding the error harmless. The evidence here did not support the voluntary manslaughter instruction. Although Fleenor argues that his emotional state was the "linchpin of this case," he still has not identified "any appreciable evidence of sudden heat" that would have supported a voluntary manslaughter instruction. See *Fleenor II* at 146, quoting *Roark v. State*, 573 N.E.2d 881, 882 (Ind.1991). The evidence showed that Fleenor bought the murder weapon at about 4:00 p.m., broke into the Harlows' home about 7:00 p.m., hid in a closet, and then emerged after the Harlows arrived home about 7:30 p.m. He then shot and wounded Bill Harlow, and ordered his wife and children to sit down. Fleenor then granted Nyla Jean Harlow permission to aid her wounded husband. As she was trying to help him, Fleenor shot her in the head, killing her. When he later shot Bill in the head, killing him, despite Bill's and Sandra Sedam's pleas, there was not the slightest indication of "sudden heat." There simply is no evidence of "sudden heat" here. Accord, *Williams v. Parke*, 133 F.3d 971, 973 (7th Cir.1997) (error in voluntary manslaughter instruction in Indiana murder case was harmless where evidence of premeditation was clear and there was no evidence of "sudden heat");

*Stevens v. State*, 691 N.E.2d 412, 425–27 (Ind.1997) (no error in refusing voluntary manslaughter instruction where there was no evidence of "sudden heat"); *Williams v. State*, 646 N.E.2d 80, 82 (Ind.App.1995) (same). Cf. *Beck v. Alabama*, 447 U.S. 625, 637, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) (death sentence unconstitutional where jury was not permitted to consider verdict of guilty to lesser-included noncapital offense where evidence would have supported such a verdict). Fleenor is not entitled to relief on this basis.

In his petition, Fleenor has also raised challenges to several other instructions, all of which were addressed by the Supreme Court of Indiana in *Fleenor II*, 622 N.E.2d at 146–48. Fleenor has not shown that any of those instructions violated his federal constitutional rights.

## VIII. *PROSECUTOR'S USE OF EVIDENCE OF FUTURE DANGEROUSNESS*

During the guilt-innocence phase of the trial, psychiatrist Dr. Gordon Brown testified that Fleenor had an antisocial personality disorder that was unlikely to change. He also testified that Fleenor would, if given the opportunity, "continue to involve himself in similar behavior in the future." 14 TR 4488. The prosecutor used this opinion from Dr. Brown in closing argument in the guilt-innocence phase and in cross-examination of defense witnesses and closing argument in the penalty phase. Fleenor argues that the prosecutor's use of the opinion violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. The Eighth Amendment claim must be rejected in light of *Simmons v. South Carolina*, 512 U.S. 154, 162–66 & n. 5, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) ("The State is free to argue that the defendant will pose a danger to others in prison and that executing him is the only means of eliminating the threat to the safety of other inmates or prison staff."). The Fourteenth Amendment claim is that the mention of this opinion of Dr. Brown

rendered the guilt-innocence phase of the trial fundamentally unfair. In light of Fleenor's effort to establish a mental status defense at the guilt-innocence phase, Dr. Brown's comment was sufficiently related to his diagnosis of Fleenor as not to have amounted to a violation of the Fourteenth Amendment. Even if there was a violation at the guilt-innocence phase, moreover, such an error would have been harmless beyond a reasonable doubt in view of the overwhelming evidence of Fleenor's guilt. See also *Fleenor II*, 622 N.E.2d at 149 (prosecution made only "slight" use of comment, at least at guilt-innocence phase). The Fifth and Sixth Amendment claims require a closer look at the relevant defense and prosecution evidence and the parties' use of that evidence in both phases of the trial.

### A. The Evidence Relevant to Future Dangerousness

The prosecution brought out Dr. Brown's opinion as part of its effort to rebut Fleenor's defenses based on his mental condition. During the guilt-innocence phase of the trial, the defense conceded that Fleenor had in fact shot and killed Bill and Nyla Jean Harlow. Defense counsel told the jury that they were not asking for a "not guilty" verdict on the murder charges. Although Fleenor had entered a plea of not responsible by reason of insanity, the psychiatrists and psychologist who testified at trial all testified that Fleenor was not insane at the time of the murders. During closing argument, the defense counsel asked for a verdict of "guilty but mentally ill." See 15 TR 4575, 4623, 4626–27.

To support this defense, Fleenor called Dr. Paul Campbell, a clinical psychologist who had examined Fleenor in October 1983. Dr. Campbell had initially diagnosed Fleenor as having characteristics of an antisocial personality disorder. After more thought he had made a "dual diagnosis" that added "borderline personality disorder." 14 TR 4327–29. He testified that Fleenor was "not psychotic" but that, under extreme stress, someone with borderline personality disorder can exhibit psychotic symptoms. 14 TR 4339–40. Defense counsel and Dr. Campbell used the term "transient psychotic episode" to describe such an incident. Dr. Campbell testified that an act performed by such a person during a transient psychotic episode would be considered the act of an insane person. 14 TR 4340. (Dr. Campbell's testimony shows that he was well aware of the legal definition of insanity in Indiana law.) On cross-examination, however, Dr. Campbell conceded that a transient psychotic episode was only a possible explanation for Fleenor's killing of the Harlows, not that it was the probable explanation. 14 TR 4342. He also testified that Fleenor was not psychotic and not insane, but mentally ill. 14 TR 4355, 4363, 4366–67, 4372. Dr. Campbell agreed that the personality disorder was not of recent origin in Fleenor but was a long term condition. He also testified that such personality disorders would be "quite resistant to treatment." 14 TR 4358.

Before the trial, the court had appointed psychiatrists Dr. Gordon Brown and Dr. Joseph Fitzgerald to examine Fleenor to determine his competency to stand trial and to evaluate his insanity defense. After both the State and the defense had rested in the guilt/innocence phase of the trial, the court called Dr. Brown and Dr. Fitzgerald to testify about Fleenor's mental condition. In response to questions from the judge and counsel, Dr. Brown testified that Fleenor had an antisocial personality disorder but was not insane, did not suffer from borderline personality disorder, and was not psychotic. 14 TR 4468, 4481, 4485A. The cross-examination by the prosecutor concluded with the following exchange:

Q Now, when you uh talked to the defendant and he did not express uh little or of any guilt or remorse? [sic]

A That is correct.

Q What's the prognosis uh for the defendant's condition uh for improvement?

A In my opinion, and in psychiatry and statistically, in general, the prognosis for such a person is considered very guarded.

A It is unlikely his condition will change?

A It is unlikely, yes.

Q And uh is it your opinion that given the opportunity, he will continue to involve himself in similar behavior in the future?

A Yes.

Q No further questions.

14 TR 4488. The prosecutor referred to this exchange in the rebuttal portion of his closing argument at the guilt-innocence phase of the trial:

> [Dr. Fitzgerald] said his personality disorder did not disrupt or rupture his personality or his ego. In other words, the defendant was not controlled by his mental illness; not controlled by his mental illness. We have an intact personality here. We don't have someone who's fragmented—who's lost touch with reality. His ego and his personality·was not ruptured. That's the testimony of Dr. Brown. He also said he was unlikely to improve. He will continue to involve himself in similar conduct, in the future, given the opportunity. And if you remove the drugs and alcohol that the defendant testified he consumed, which no one else can verify, then no amnesia.

15 TR 4655. This argument came in the context of the prosecutor's review of both psychiatrists' opinions that Fleenor was not legally insane at the time of the murders.

During the penalty phase of the trial, the defense called two clergymen to provide mitigation evidence. In cross-examining both of them, the prosecution used Dr. Brown's earlier answer about the danger that Fleenor would "continue to involve himself in similar behavior in the future." Reverend Delbert Walters had testified that he thought Fleenor had a possibility of redemption and that he could be productive even in prison. 15 TR 4733. The prosecutor told Reverend Walters of Dr. Brown's opinion and asked if he disagreed with that. Reverend Walters answered: "He very well could, if he—if he doesn't uh come to Jesus Christ and know the saving power and the keeping power of Christ, himself." 15 TR 4735. Father Duff Green testified that he thought Fleenor could adjust to prison life, 15 TR 4741–42, and that the State would not be any safer by putting Fleenor to death, 15 TR 4747. The prosecutor repeated Dr. Brown's opinion and asked Father Green whether he disagreed with that opinion. Father Green said he had no judgment or basis for judgment on that opinion. 16 TR 4755–56.

In the argument at the penalty phase, the prosecutor made further use of Dr. Brown's opinion and other evidence suggesting that Fleenor posed continuing threats to the safety of others. That evidence included the evidence of the plan to escape from jail, including the letters to Debra Slaughter. 16 TR 4987–91. During the rebuttal argument, the prosecutor reminded the jury again about the escape attempt, 17 TR 5071–72, argued that Fleenor had deliberately committed the murders expecting a life ·sentence, and had simply miscalculated because he had not known the death penalty might apply, 17 TR 5083–84. The prosecutor then said:

> We have a chance to protect ourselves. We have a chance to say, No, you're not gonna spend the rest of your life in our prison system, poisoning the minds of the people who are going to be let out. We're tired of this mentality; we have a right to protect ourselves; we have a right to protect the prison guards; we have a right to sleep at night not thinking that·Mr. Fleenor is going to be escaping or planning his escape. And

we have a right to have an ultimate punishment in our society.

17 TR 5084.

B. *The Fifth Amendment Challenge to Dr. Brown's Opinion*

██ When the State seeks to use against a defendant evidence from a psychiatric examination, both the Fifth and Sixth Amendments impose some limitations. In *Estelle v. Smith*, 451 U.S. 454, 468, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Supreme Court held that a defendant's Fifth Amendment rights were violated by the prosecution's use in the penalty phase of a capital trial the results of a psychiatric examination when the defendant had not put his mental condition in issue and had not been advised before the examination that he had a right to remain silent and that his statements could be used against him. The Court in *Smith* also held that the defendant's Sixth Amendment rights were violated because he was entitled to assistance of counsel in deciding whether to cooperate with such an examination, which requires that the attorney have prior notice of the examination and its intended scope. 451 U.S. at 470–71, 101 S.Ct. 1866. Courts must take care to analyze separately these closely related issues. See *Powell v. Texas*, 492 U.S. 680, 684–85, 109 S.Ct. 3146, 106 L.Ed.2d 551 (1989) (summarily reversing state court decision that failed to distinguish between Fifth and Sixth Amendment issues).[15]

Because Fleenor used evidence of his mental status at both phases of his trial, his Fifth Amendment claim must fail. In *Smith* itself, the Supreme Court took care to emphasize the fact that the defendant had not put his mental condition in issue. See 451 U.S. at 465–66 & n. 10, 468, 101 S.Ct. 1866. In *Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), the Court directly addressed the application of *Smith* where the defendant

puts his mental condition in issue. In *Buchanan* the defendant tried to prove the defense of "extreme emotional disturbance" using evidence of prior psychological evaluations. Early in the pending murder case, the defendant and prosecutor had jointly moved for a psychiatric evaluation. Over the defendant's objections at trial, the prosecutor was permitted to rebut the defense by using evidence of other psychological evaluations and the pretrial psychiatric examination that had addressed the defendant's competency to stand trial. The Supreme Court distinguished the case from *Smith* precisely because the defendant had put his mental condition in issue. The defendant had therefore waived his Fifth Amendment privilege concerning the examination that he had requested. 483 U.S. at 422–23, 107 S.Ct. 2906.

Because Fleenor put his mental condition in issue in both the guilt-innocence and penalty phases of this trial, *Buchanan v. Kentucky* controls the Fifth Amendment analysis and shows that there was no Fifth Amendment violation in the prosecution's use of Dr. Brown's opinions. Accord, *Savino v. Murray*, 82 F.3d 593, 604 (4th Cir.1996) (capital defendant waived Fifth Amendment rights by requesting psychiatric examination). Fleenor tries to distinguish the Fifth Amendment waiver holding in *Buchanan* on the ground that, unlike Fleenor, Buchanan had not taken the stand in his own defense, leaving the prosecution with only the psychiatric evaluation as evidence to refute Buchanan's mental status defense. See 483 U.S. at 423, 107 S.Ct. 2906.

This distinction is not persuasive. Fleenor's theory seems to be that because the prosecution here had the opportunity to cross-examine Fleenor himself, it should have been satisfied with his answers and should not have been permitted to rebut

---

**15.** Although defense counsel made no objection to the prosecutor's questions to Dr. Brown about future danger or to his use of the opinion in closing arguments, the Supreme Court of Indiana addressed these issues on the merits. *Fleenor II*, 622 N.E.2d at 148–50. This court may therefore reach the merits of these claims.

them by using Dr. Brown's testimony. There is no suggestion in *Smith, Buchanan,* or other cases in that line that would restrict the Fifth Amendment waiver to defendants who choose not to testify, and such a restriction would not make sense. The prosecution should not have to be so limited in trying to rebut the defendant's evidence of his mental condition, especially where, as here, the defense relies on expert evidence. See, *e.g., Schneider v. Lynaugh,* 835 F.2d 570, 577 (5th Cir.1988) (*Buchanan* rejected argument that prosecution should have to content itself with other alternatives for rebutting defense experts), citing *United States v. Byers,* 740 F.2d 1104, 1114 (D.C.Cir.1984) (*en banc*) (plurality opinion of Scalia, J.) ("Ordinarily the only effective rebuttal of psychiatric opinion testimony is contradictory opinion testimony."); *Re v. State,* 540 A.2d 423, 429–30 (Del.1988) (rejecting attempt to distinguish *Buchanan* on grounds that defendant testified and was subject to cross-examination, but claimed (as Fleenor did here) to have forgotten events surrounding murder). After Fleenor put his mental condition at issue, the prosecution was free to offer a range of available evidence to rebut the defenses. The prosecution was entitled to draw from Dr. Brown his opinions and supporting facts that tended to undermine Fleenor's mental status defenses, and the use of his opinion at both phases of the trial did not violate Fleenor's Fifth Amendment rights.

## C. *The Sixth Amendment Challenge to Dr. Brown's Opinion*

 Fleenor's Sixth Amendment claim requires separate analysis, although the same Supreme Court decisions are critical. In *Estelle v. Smith,* the Supreme Court held that a defendant facing a court-ordered psychiatric examination has a Sixth Amendment right to the assistance of counsel in deciding whether to submit to the examination. 451 U.S. at 471, 101 S.Ct. 1866. For that assistance to be effective, defense counsel must have prior notice of the scope of the examination. *Id.*

In this case, Fleenor and his lawyers knew that Dr. Brown would be examining Fleenor to evaluate his competence to stand trial and his sanity at the time of the murders. Fleenor argues, however, that neither he nor his lawyers had any advance word that Dr. Brown would also form an opinion concerning Fleenor's future dangerousness for use in the trial. See 6 PC 1322–24, 1442–44, 7 PC 1743–44. The court finds no violation of Fleenor's Sixth Amendment rights in the use of Dr. Brown's opinion.

*Buchanan v. Kentucky* dealt with a similar Sixth Amendment claim and established some limits on the principles set forth in *Smith.* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987). In *Buchanan* the defense and the prosecution had jointly requested a psychiatric evaluation to determine whether the defendant needed psychiatric treatment (but not to determine his competency to stand trial). 483 U.S. at 410–11 & n. 11, 107 S.Ct. 2906. During the guilt-innocence phase of the trial, the defendant presented evidence of several psychological evaluations to support his defense of "extreme emotional disturbance." The prosecution then offered the results of the jointly requested examination, which did not indicate psychological problems. The defendant argued that use of those results also violated his Sixth Amendment rights because he and his counsel had not anticipated that the results might be used to undermine his mental status defense. The Supreme Court rejected the claim:

> Petitioner, however, misconceives the nature of the Sixth Amendment right at issue here by focusing on the use of Doctor Lange's report rather than on the proper concern of this Amendment, the consultation with counsel, which petitioner undoubtedly had. Such consultation, to be effective, must be based on counsel's being informed about the scope and nature of the proceeding. There is no question that petitioner's counsel had this information. To be sure, the effec-

tiveness of the consultation also would depend on counsel's awareness of the possible uses to which petitioner's statements in the proceeding could be put. Given our decision in *Smith*, however, *counsel was certainly on notice that if, as appears to be the case, he intended to put on a 'mental status' defense for petitioner, he would have to anticipate the use of psychological evidence by the prosecution in rebuttal.* In these circumstances, then, there was no Sixth Amendment violation.

*Id.* at 424–25, 107 S.Ct. 2906 (footnote omitted) (emphasis added).

Fleenor counters by relying on *Powell v. Texas*, 492 U.S. 680, 109 S.Ct. 3146, 106 L.Ed.2d 551 (1989). In that case the defendant relied on a defense of insanity at the guilt-innocence phase but was found guilty. Before trial the defendant had been evaluated by a psychiatrist and psychologist to determine his competency to stand trial and his sanity at the time of the offense. At sentencing the prosecution was permitted to use the results of these evaluations to prove future dangerousness.[16] The evaluations had been conducted without specific notice to defense counsel that they would include examination on the issue of future dangerousness. The Supreme Court assumed that the defendant had waived his Fifth Amendment privilege by relying on an insanity defense but held that the use of the examinations violated the Sixth Amendment because defense counsel had not been on notice that the defendant was being examined concerning future dangerousness. 492 U.S. at 685, 109 S.Ct. 3146. The *Powell* Court noted that the defendant had lost in *Buchanan* on the Sixth Amendment issue precisely because his counsel had known in advance of the scope of the examination. *Id. Powell* then said in a footnote:

Unlike in *Buchanan*, our decision in *Smith* did not place petitioner's attorney on notice concerning the scope or intended use of the psychiatric examinations. Most significantly, although the Texas Court of Criminal Appeals only recently rendered a decision on his direct appeal, petitioner was tried and convicted before *Smith* was decided. Moreover, even if counsel had anticipated the *Smith* decision, he would only have been on notice that by raising a mental-status defense he might open the door to "use of psychological evidence by the prosecution in rebuttal." *Buchanan*, 483 U.S. at 425, 107 S.Ct. 2906 (footnote omitted). Nothing in *Smith*, or any other decision of this Court, suggests that a defendant opens the door to the admission of psychiatric evidence on future dangerousness by raising an insanity defense at the guilt stage of the trial.

492 U.S. at 685–86 n. 3, 109 S.Ct. 3146. This footnote lends some support to Fleenor's argument that Dr. Brown's evaluation of him to determine competency and sanity could not be used to show at sentencing to show his future dangerousness. The footnote recognizes, however, that a defendant who raises a mental status defense should anticipate that the prosecution may use available psychological evidence in rebuttal, as the Court held in *Buchanan*. To accept Fleenor's Sixth Amendment argument, the court would first need to overlook the fact that the prosecution here used Dr. Brown's opinion in rebuttal at both the guilt-innocence phase and the sentencing phase. The court would also need to find a sharp line for Sixth Amendment purposes between an examination to determine sanity and an examination that produces any opinion about the defendant's prognosis. *Buchanan* rejected such a sharp distinction, holding that when counsel requested a broad psychiatric examination, he was on notice

---

**16.** Under Texas law, a defendant cannot be sentenced to death unless the prosecution proves beyond a reasonable doubt that "there is a probability that the defendant would com-

mit criminal acts of violence that would constitute a continuing threat to society." See *Estelle v. Smith*, 451 U.S. at 458, 101 S.Ct. 1866.

that if he put on a "mental status" defense, the prosecution might use the results of the examination in rebuttal. 483 U.S. at 424–25, 107 S.Ct. 2906.[17]

In this case there is no sharp line separating an examination to determine sanity and an examination to evaluate future danger. Drs. Brown, Fitzgerald, and Campbell all evaluated Fleenor to determine sanity at the time of the murders. Dr. Brown's opinion about Fleenor's prognosis flowed from his diagnosis. (It should also be noted here that defense expert Dr. Campbell testified that Fleenor's personality disorder would be "quite resistant to treatment." 14 TR 4358.) As the Supreme Court of Indiana observed in this case, Fleenor's counsel knew that "the nature of any mental disorder or behavioral problem would be explored in detail, including any persistent and continuing patterns of violent conduct." 622 N.E.2d at 149. Counsel had to expect that Dr. Brown would offer a psychiatric diagnosis of Fleenor. It is only natural for such a diagnosis to include consideration of Fleenor's prognosis—his prospects for treatment, improvement, or deterioration—and that is exactly what Dr. Brown provided in the challenged testimony. The examination did not exceed the scope of examination known to defense counsel, nor was its use by the prosecution unforeseeable.

In addition, Dr. Brown's opinion was used in the penalty phase only to rebut Fleenor's evidence and argument in mitigation—especially the evidence and arguments focused on his mental status and the defense assertions that Fleenor would pose no further danger upon being sentenced to a very long term in prison. Dr. Campbell's direct testimony attempted, at least in part, to lay an evidentiary foundation for the theory that Fleenor murdered the Harlows in the course of a "transient psychotic episode." Although Dr. Campbell testified that an act performed by a person during a transient psychotic episode would be considered the act of an insane person under the Indiana legal standard, he also testified that Fleenor was not psychotic and not insane, although he was mentally ill. Thus, at least some of Dr. Campbell's direct testimony could reasonably be interpreted as an attempt to show that Fleenor's murder of the Harlows was a transient or temporary phenomenon resulting from the extreme stress assertedly caused by Fleenor's divorce from Sandra Sedam and the accompanying disruptions in his life. Although the defense may not have made the explicit inference from this testimony that there was no future danger, that inference was sufficiently clear from Dr. Campbell's testimony that the prosecution was entitled to try to rebut it. It did so first in having Dr. Campbell describe Fleenor's personality disorder as a "long term" condition rather than something of recent origin, and by having him concede that such personality disorders would be

17. From the Texas court's opinions in *Powell*, it appears that the contested psychological evidence of future dangerousness in that case was also used at least in part in response to defense evidence about the defendant's mental condition. See *Powell v. State*, 742 S.W.2d 353, 357–59 (Tex.Crim.App.1987), *vacated*, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 926 (1988), *on remand, Powell v. State*, 767 S.W.2d 759, 760–61 (Tex.Crim.App.1989), *reversed*, 492 U.S. 680, 109 S.Ct. 3146, 106 L.Ed.2d 551 (1989). Thus, there appears to be some tension between the Supreme Court's Sixth Amendment analysis in *Buchanan* and its footnote 3 in *Powell*. This court understands footnote 3 in *Powell* to have addressed the specific problem posed by the "future danger" element of Texas death penalty cases, which is not a matter for rebuttal but is instead an essential element of the prosecution's case at sentencing when seeking the death penalty under Texas law. If footnote 3 was intended to draw, as a matter of Sixth Amendment jurisprudence, a bright line between psychiatric examinations for the purpose of evaluating sanity and those for the purpose of evaluating future danger, that result would appear to conflict with the Sixth Amendment holding in *Buchanan*. This court does not read footnote 3 in *Powell* as prohibiting the prosecution from using results of a sanity evaluation to rebut a defendant's psychological evidence in mitigation at sentencing unless someone had specifically warned the defense counsel before the examination of such possible use.

"quite resistant to treatment." Along these lines, the prosecution then developed Dr. Brown's testimony on Fleenor's prognosis, which produced the answer that the prognosis was "very guarded," that it was "unlikely his condition will change," and that, "given the opportunity, he will continue to involve himself in similar behavior in the future."

In view of the scope of the defense efforts to establish some support for a mental status defense and to provide mitigating evidence at the penalty phase, it was not unreasonable or unfair for the prosecution to rebut those efforts with the questions to both Dr. Campbell and Dr. Brown about the prognosis for possible improvement in the antisocial personality disorder. The use of Dr. Brown's opinion was within the scope of the examination and its uses that defense counsel could reasonably have anticipated. See *Savino v. Murray,* 82 F.3d 593, 604–05 (4th Cir. 1996) (Sixth Amendment did not require specific warning that results of psychiatric evaluation requested by defense could be used to show future dangerousness); *Woomer v. Aiken,* 856 F.2d 677, 682 (4th Cir.1988) (Sixth Amendment did not require specific warning that results of sanity examination could be used to comment on potential future dangerousness; "When defense counsel consented to the sanity evaluation, he obviously anticipated that the evaluation and resulting psychiatric opinions might be beneficial to his client's case, but he also must have been fully aware that if they were unfavorable they might be used for an adverse objective."); *Schneider v. Lynaugh,* 835 F.2d 570, 577–78 (5th Cir.1988) (after defendant offered evidence from counselors of his potential for rehabilitation, prosecution's rebuttal use of opinion of psychiatrist who examined defendant for competency did not violate Sixth Amendment); *Re v. State,* 540 A.2d 423, 430 (Del.1988) (after defendant asserted mental status defense, prosecution's rebuttal use of opinion of psychiatrist who examined defendant for competency did not violate Sixth Amendment);

cf. *Delguidice v. Singletary,* 84 F.3d 1359, 1362–63 (11th Cir.1996) (under Sixth Amendment, notice to counsel that defendant would be examined to determine competency was not sufficient notice to permit State to use examination to address sanity at time of crime).

In sum, then, the prosecution's use of the Dr. Brown's opinion did not violate Fleenor's rights under the Fifth, Sixth, Eighth, or Fourteenth Amendments. Fleenor is not entitled to relief on any of these theories.

## IX. THE TRIAL COURTS RELIANCE ON AGGRAVATING CIRCUMSTANCES TO SUPPORT THE DEATH SENTENCE

The trial court sentenced Fleenor to death after stating there was "no question" but that the aggravating circumstances of his crime outweighed any mitigating circumstances. 17 TR 5119. The trial court identified three aggravating circumstances: (1) Fleenor murdered the Harlows while he was committing the crime of burglary, (2) he murdered the Harlows by lying in wait in the Harlows' home, and (3) he committed two murders. 17 TR 5120; see Ind.Code § 35–50–2–9(b)(1), (3), and (7). The trial court found that Fleenor did not meet any of the listed mitigating circumstances. He had a significant prior criminal history; he was not subject to "extreme mental or emotional disturbance" when he murdered the Harlows; there was no evidence the Harlows were participants in or consented to Fleenor's conduct, or that Fleenor was only an accomplice, or that he was under the control or domination of another person. 17 TR 5120–21. The court also noted that no psychiatrist or psychologist found that Fleenor's capacity to appreciate the criminality of his conduct or to conform his conduct to law was substantially impaired as a result of mental disease or defect or intoxication.

Fleenor argues that the trial court improperly considered the first two of these aggravating factors. He contends, pursuant to *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), that the evidence could not have permitted a rational trier of fact to find beyond a reasonable doubt (1) that he committed the murders in the course of a burglary or (2) that he committed the murders by lying in wait. The evidence showed that Fleenor told other persons a day earlier that he was going to kill the Harlows, his wife, and his children, 11 TR 3567, and that he would be spending the rest of his life in jail, 11 TR 3590. The afternoon of December 12, 1982, he bought a pistol. After encountering his wife at an evening church service, Fleenor got a ride from a friend to the Harlows' house and had the friend knock at the door to see if anyone was home. 11 TR 3682–84, 3700–06. Fleenor then pried open the backdoor of the Harlows' house, replaced the screws to conceal the evidence of the break-in, and hid in a bedroom closet and waited. 12 TR 3781. After the Harlows, the children, and his wife returned to the house, Fleenor appeared in a hallway, shot Bill Harlow, later shot and killed Nyla Jean Harlow, then still later fired the second shot that killed the already wounded Bill Harlow.

The evidence amply supported all of the aggravating factors found by the trial court. Indiana defines the crime of burglary as breaking and entering a building with the intent to commit a felony in the building. Ind.Code § 35–43–2–1. The fact that the intended felony supporting the burglary charge was murder does not bar reliance on murder in the course of a burglary as an aggravating circumstance for purposes of applying the death penalty. Fleenor has cited no authority to the contrary and the court is aware of none. It is difficult to see why the law should treat an intended murder committed in part by breaking into a home as less culpable and less deserving of the death penalty than an unplanned killing committed in the course of a burglary committed for another purpose, such as theft.

Fleenor has argued that some evidence would have supported a finding that the murders were not committed by lying in wait. Specifically, he points out that the first shot at Bill Harlow—the one most immediately after Fleenor's emergence from his hiding place—was not fatal, and that after he was wounded, Bill told Nyla Jean to get his gun (a sawed-off shotgun under a mattress in the bedroom), after which Fleenor killed both Nyla Jean and Bill. While perhaps a finder of fact might have found this evidence sufficiently persuasive so as not to find that both murders were committed by lying in wait, that is far short of the showing required under *Jackson v. Virginia*. See also *Wright v. West*, 505 U.S. 277, 296–97, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (explaining "sharply limited nature of constitutional sufficiency review" pursuant to *Jackson*). A rational finder of fact could find beyond a reasonable doubt that Fleenor committed both murders by lying in wait. The trial court did not violate Fleenor's constitutional rights in its findings on the aggravating circumstances supporting the death penalty in this case.

## X. *CHALLENGES TO INDIANA'S DEATH PENALTY STATUTE*

Fleenor's petition raises a number of challenges to the constitutionality of Indiana's death penalty statute, Ind.Code § 35–50–2–9. He contends that the statute violates the Fifth, Sixth, Eighth, and Fourteenth Amendments for the following reasons:

A. The statute allows "arbitrary and capricious selection of those who.are to die due to unchecked and standardless discretion granted the prosecutor...." [But see *Gregg v. Georgia*, 428 U.S. 153, 199, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (power of prosecutor to exercise discretion did not render death penalty unconstitutional).]

B. There is no provision to exclude potential jurors who would vote for the death penalty for all homicides regardless of the facts of the crime or the individual offender. [The trial court's actions in voir dire complied with the constitutional rules set forth in *Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). There is no reason apparent to this court why those rules must also be enacted into statutory language. See also *Fleenor I*, 514 N.E.2d at 91; *Burris v. State*, 465 N.E.2d 171 (1984).]

C. The jury is not required to return written findings in recommending a death sentence. [Under Indiana law, however, the judge is the sentencer, and the judge made specific findings in this case sufficient for meaningful appellate review.]

D. The statute permits arbitrary and capricious imposition of the death penalty because it does not "specifically guide the sentencer's discretion in weighing the aggravating circumstances and mitigating circumstances." [But see *Schiro v. Clark*, 963 F.2d 962, 969 (7th Cir. 1992) (rejecting similar challenge).]

E. The statute does not require the judge to find the aggravating circumstances are true beyond a reasonable doubt before imposing the death sentence. [But see Ind.Code § 35-50-2-9(e) (aggravating factors must be proved beyond a reasonable doubt); *Williams v. State*, 430 N.E.2d 759, 765 (Ind.1982) (same).]

F. The statute permits execution of a murderer who did not have the intent to kill. [But see *Tison v. Arizona*, 481 U.S. 137, 157, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (death penalty may be imposed where defendant acts with reckless disregard for human life by knowingly engaging in criminal activity known to carry grave risk of death). Also,

the Supreme Court of Indiana correctly held that the evidence in this case was sufficient to prove beyond a reasonable doubt that Fleenor intended to kill both Bill and Nyla Harlow. *Fleenor I*, 514 N.E.2d at 85. Also, the aggravating factor for burglary required proof beyond a reasonable doubt that the defendant intentionally killed the victim, see Ind.Code § 35-50-2-9(b)(1), and the defense conceded that aggravating factor at trial.]

G. The statute permits burglary to be used as both an independent offense and as the aggravating element of capital murder.

H. The statute does not prescribe "specific rules to govern the Indiana Supreme Court's review of death sentences."

I. The statute does not require any "comparative proportionality review" to determine whether the death sentence is being imposed in similar fact situations. [But see *Pulley v. Harris*, 465 U.S. 37, 50–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) (comparative proportionality review by appellate court not required in every death penalty case).]

Fleenor has not developed these challenges in this court. Instead, he "acknowledges that the Seventh Circuit ... has upheld the constitutionality of this statute," and he seeks to preserve these arguments for possible future review in the Supreme Court of the United States. Fleenor Mem. at 86. Under the decisions this court must follow, these challenges offer no basis for this court to vacate Fleenor's death sentence. See generally *Schiro v. Clark*, 963 F.2d at 969.

### Conclusion

Petitioner D.H. Fleenor's convictions for two murders and burglary and his sentence of death did not violate the Constitution or laws or treaties of the United

States. His petition for a writ of habeas corpus is therefore DENIED. The court will enter judgment accordingly.